[L.A. No. 30687. Mar. 16, 1978.]

MICHAEL SEAN DALY, a Minor, etc., et al.,
Plaintiffs and Appellants, v.
GENERAL MOTORS CORPORATION et al.,
Defendants and Respondents.

**COUNSEL**

Lawrence J. Moreno and Al Schallau for Plaintiffs and Appellants.

Robert E. Cartwright, Edward I. Pollock, Leroy Hersh, David B. Baum, Stephen I. Zetterberg, Robert G. Beloud, Ned Good, Arne Werchick, Sanford M. Gage, Leonard Sacks and Joseph Posner as Amici Curiae on behalf of Plaintiffs and Appellants.

Grace, Neumeyer & Otto, Grace & Neumeyer, Eugene R. Grace, Richard A. Neumeyer, Arthur Paul Berg, Frazer F. Hilder, Gerald J. Gannon and Otis Smith for Defendants and Respondents.

Acret & Perrochet, Archbald, Zelezney & Spray, Brill, Hunt, DeBuys & Burby, Carroll, Burdick & McDonough, J. D. Burdick, Chase, Rotchford, Drukker & Bogust, Cummins, White & Breidenbach, Dryden, Harrington & Swartz, Stephen J. Grogan, Hillsinger & Costanzo, John J. Costanzo, Holt, Rhodes & Hollywood, Lynberg & Mills, Morgan, Wenzel & McNicholas, Murchison & Cumming, Ruston, Nance, McCormick & DiCaro, Schell & Delamer, Shield & Smith, Theodore P. Shield and Wilson, Borrer & Dunn as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

RICHARDSON, J.—The most important of several problems which we consider is whether the principles of comparative negligence expressed by us in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], apply to actions founded on strict products liability. We will conclude that they do. We also inquire whether evidence of "compensating" safety devices installed in a motor vehicle by its manufacturer is admissible to offset alleged design deficiencies, and whether, under the particular facts herein, evidence of a driver's claimed intoxication or of his asserted failure to use his vehicle's safety equipment may be considered. While agreeing that evidence of compensating design characteristics is admissible, we will further determine that under the circumstances herein prejudicial error requiring reversal occurred upon the admission of evidence of the decedent's alleged intoxication and failure to use safety devices in his vehicle.

### THE FACTS AND THE TRIAL

Although there were no eyewitnesses, the parties agree, generally, on the reconstruction of the accident in question. In the early hours of October 31, 1970, decedent Kirk Daly, a 36-year-old attorney, was driving his Opel southbound on the Harbor Freeway in Los Angeles. The vehicle, while travelling at a speed of 50-70 miles per hour, collided with and damaged 50 feet of metal divider fence. After the initial impact between the left side of the vehicle and the fence the Opel spun counterclockwise, the driver's door was thrown open, and Daly was forcibly ejected from the car and sustained fatal head injuries. It was equally undisputed that had the deceased remained in the Opel his injuries, in all probability, would have been relatively minor.

Plaintiffs, who are decedent's widow and three surviving minor children, sued General Motors Corporation, Boulevard Buick, Underwriter's Auto Leasing, and Alco Leasing Company, the successive links in the Opel's manufacturing and distribution chain. The sole theory of plaintiffs' complaint was strict liability for damages allegedly caused by a defective product, namely, an improperly designed door latch claimed to have been activated by the impact. It was further asserted that, but for the faulty latch, decedent would have been restrained in the vehicle and, although perhaps injured, would not have been killed. Thus, the case involves a so-called "second collision" in which the "defect" did not

contribute to the original impact, but only to the "enhancement" of injury.

At trial the jury heard conflicting expert versions as to the functioning of the latch mechanism during the accident. Plaintiffs' principal witness testified that the Opel's door was caused to open when the latch button on the exterior handle of the driver's door was forcibly depressed by some protruding portion of the divider fence. It was his opinion that the exposed push button on the door constituted a design "defect" which caused injuries greatly in excess of those which Daly would otherwise have sustained. Plaintiffs also introduced evidence that other vehicular door latch designs used in production models of the same and prior years afforded substantially greater protection. Defendants' experts countered with their opinions that the force of the impact was sufficiently strong that it would have caused the door to open resulting in Daly's death even if the Opel had been equipped with door latches of the alternative designs suggested by plaintiffs.

Over plaintiffs' objections, defendants were permitted to introduce evidence indicating that: (1) the Opel was equipped with a seat belt-shoulder harness system, and a door lock, either of which if used, it was contended, would have prevented Daly's ejection from the vehicle; (2) Daly used neither the harness system nor the lock; (3) the 1970 Opel owner's manual contained warnings that seat belts should be worn and doors locked when the car was in motion for "accident security"; and (4) Daly was intoxicated at the time of collision, which evidence the jury was advised was admitted for the limited purpose of determining whether decedent had used the vehicle's safety equipment. After relatively brief deliberations the jury returned a verdict favoring all defendants, and plaintiffs appeal from the ensuing adverse judgment.

### STRICT PRODUCTS LIABILITY
### AND COMPARATIVE FAULT

In response to plaintiffs' assertion that the "intoxication-nonuse" evidence was improperly admitted, defendants contend that the deceased's own conduct contributed to his death. Because plaintiffs' case rests upon strict products liability based on improper design of the door latch and because defendants assert a failure in decedent's conduct, namely, his alleged intoxication and nonuse of safety equipment, without which the accident and ensuing death would not have occurred, there is

thereby posed the overriding issue in the case, should comparative principles apply in strict products liability actions?

It may be useful to refer briefly to certain highlights in the historical development of the two principles—strict and comparative liability. Tort law has evolved from a legal obligation initially imposed without "fault," to recovery which, generally, was based on blameworthiness in a moral sense. For reasons of social policy and because of the unusual nature of defendants' acts, liability without fault continued to be prescribed in a certain restricted area, for example, upon keepers of wild animals, or those who handled explosives or other dangerous substances, or who engaged in ultrahazardous activities. Simultaneously, and more particularly, those who were injured in the use of personal property were permitted recovery on a contract theory if they were the purchasers of the chattel or were in privity. Subsequently, liability was imposed in negligence upon the manufacturer of personalty in favor of the general consumer. (For a comprehensive historical review, see Prosser, Law of Torts (4th ed. 1971) § 96, pp. 641-644; 2 Harper & James, The Law of Torts (1956) § 12.2 and foll., p. 747 and foll.) Evolving social policies designed to protect the ultimate consumer soon prompted the extension of legal responsibility beyond negligence to express or implied warranty. Thus, in the area of food and drink a form of strict liability predicated upon warranty found wide acceptance. Warranty actions, however, contained their own inherent limitations requiring a precedent notice to the vendor of a breach of the warranty, and absolving him from loss if he had issued an adequate disclaimer.

General dissatisfaction continued with the conceptual limitations which traditional tort and contract doctrines placed upon the consumers and users of manufactured products, this at a time when mass production of an almost infinite variety of goods and products was responding to a myriad of ever-changing societal demands stimulated by wide-spread commercial advertising. From an historic combination of economic and sociological forces was born the doctrine of strict liability in tort.

We, ourselves, were perhaps the first court to give the new principle judicial sanction. In *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], confronted with injury to an ultimate consumer caused by a defective power tool, we fastened strict liability on a manufacturer who placed on the market a defective product even though both privity and notice of breach of warranty were lacking. We rejected both contract and warranty theories,

express or implied, as the basis for liability. Strict liability, we said, did not rest on a consensual foundation but, rather, on one created by law. The liability was created judicially because of the economic and social need for the protection of consumers in an increasingly complex and mechanized society, and because of the limitations in the negligence and warranty remedies. Our avowed purpose was "to insure that the costs of injuries resulting from defective products are borne by the manufacturer that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Id.,* at p. 63.) Subsequently, the *Greenman* principle was incorporated in section 402A of the Restatement Second of Torts, and adopted by a majority of American jurisdictions. (Prosser, *supra,* at pp. 657-658.)

■ From its inception, however, strict liability has never been, and is not now, *absolute* liability. As has been repeatedly expressed, under strict liability the manufacturer does not thereby become the insurer of the safety of the product's user. (*Cronin* v. *J. B. E. Olson Corp.* (1972) 8 Cal.3d 121, 133 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Dippel* v. *Sciano* (1967) 37 Wis.2d 443 [155 N.W.2d 55, 63]; *West* v. *Caterpillar Tractor Company, Inc.* (Fla. 1976) 336 So.2d 80, 90; Traynor, *The Ways and Meanings of Defective Products and Strict Liability* (1965) 32 Tenn.L.Rev. 363, 366-367.) On the contrary, the plaintiff's injury must have been caused by a "defect" in the product. Thus the manufacturer is not deemed responsible when injury results from an unforeseeable use of its product. (*Cronin, supra,* at p. 126; Rest.2d Torts, *supra,* coms. g, h.) Furthermore, we have recognized that though most forms of contributory negligence do not constitute a defense to a strict products liability action, plaintiff's negligence is a complete defense when it comprises assumption of risk. (*Luque* v. *McLean* (1972) 8 Cal.3d 136, 145 [104 Cal.Rptr. 443, 501 P.2d 1163]; Rest.2d Torts, § 402A, com. b.) As will thus be seen, the concept of strict products liability was created and shaped judicially. In its evolution, the doctrinal encumbrances of contract and warranty, and the traditional elements of negligence, were stripped from the remedy, and a new tort emerged which extended liability for defective product design and manufacture beyond negligence but short of absolute liability.

In *Li* v. *Yellow Cab Co., supra,* 13 Cal.3d 804, we introduced the other doctrine with which we are concerned, comparative negligence. We examined the history of contributory negligence, the massive criticism directed at it because its presence in the slightest degree completely barred plaintiff's recovery, and the increasing defection from the doctrine. We then weighed the two principal arguments against its

removal from California law, namely, that such a sharp change in direction required legislative action, and that there existed a cluster of asserted practical obstacles relating to multiple parties, the apportionment burdens on a jury and the uncertain effect on the defenses of last clear chance, assumption of risk, and wilful misconduct. Concluding that none of the obstacles was insurmountable, we announced in *Li* the adoption of a "pure" form of comparative negligence which, when present, reduced but did not prevent plaintiff's recovery. (Pp. 828-829.) We held that the defense of assumption of risk, insofar as it is no more than a variant of contributory negligence, was merged into the assessment of liability in proportion to fault. (Pp. 824-825.) Within the broad guidelines therein announced, we left to trial courts discretion in the particular implementation of the new doctrine. (Pp. 826-827.)

We stand now at the point of confluence of these two conceptual streams, having been greatly assisted by the thoughtful analysis of the parties and the valuable assistance of numerous amici curiae. We are by no means the first to consider the interaction of these two developing principles. As with the litigants before us, responsible and respected authorities have reached opposing conclusions stressing in various degrees the different considerations which we now examine.

Those counseling against the recognition of comparative fault principles in strict products liability cases vigorously stress, perhaps equally, not only the conceptual, but also the semantic difficulties incident to such a course. The task of merging the two concepts is said to be impossible, that "apples and oranges" cannot be compared, that "oil and water" do not mix, and that strict liability, which is not founded on negligence or fault, is inhospitable to comparative principles. The syllogism runs, contributory negligence was only a defense to negligence, comparative negligence only affects contributory negligence, therefore comparative negligence cannot be a defense to strict liability. (See *Butaud* v. *Suburban Marine & Sport. Goods, Inc.* (Alaska 1976) 555 P.2d 42, 47 (dis. opn. by Burke, J.), noted by Masin (1977) 4 Western St.U. L.Rev. 283, 284.) While fully recognizing the theoretical and semantic distinctions between the twin principles of strict products liability and traditional negligence, we think they can be blended or accommodated.

The inherent difficulty in the "apples and oranges" argument is its insistence on fixed and precise definitional treatment of legal concepts. In the evolving areas of both products liability and tort defenses,

however, there has developed much conceptual overlapping and inter-weaving in order to attain substantial justice. The concept of strict liability itself, as we have noted, arose from dissatisfaction with the wooden formalisms of traditional tort and contract principles in order to protect the consumer of manufactured goods. Similarly, increasing social awareness of its harsh "all or nothing" consequences led us in *Li* to moderate the impact of traditional contributory negligence in order to accomplish a fairer and more balanced result. We acknowledged an intermixing of defenses of contributory negligence and assumption of risk and formally effected a type of merger, "As for assumption of risk, we have recognized in this state that this defense overlaps that of contributory negligence to some extent . . . ." (*Li, supra,* at p. 824.) ▮ In *Li,* we further reaffirmed our observation in *Grey* v. *Fibreboard Paper Products Co.* (1966) 65 Cal.2d 240, 245 [53 Cal.Rptr. 545, 418 P.2d 153]: " '[T]hat in one kind of situation, to wit, where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence . . . .' We think it clear that the adoption of a system of comparative negligence should entail the merger of the defense of assumption of risk into the general scheme of assessment of liability in proportion to fault in those particular cases in which the form of assumption of risk involved is no more than a variant of contributory negligence." (13 Cal.3d at pp. 824-825, quoting *Grey, supra,* at pp. 245-246, italics in original.)

▮ Furthermore, the "apples and oranges" argument may be conceptually suspect. It has been suggested that the term "contributory negligence," one of the vital building blocks upon which much of the argument is based, may indeed itself be a misnomer since it lacks the first element of the classical negligence formula, namely, a duty of care owing to another. A highly respected torts authority, Dean William Prosser, has noted this fact by observing, "It is perhaps unfortunate that contributory negligence is called negligence at all. 'Contributory fault' would be a more descriptive term. Negligence as it is commonly understood is conduct which creates an undue risk of harm to others. Contributory negligence is conduct which involves an undue risk of harm to the actor himself. Negligence requires a duty, an obligation of conduct to another person. Contributory negligence involves no duty, unless we are to be so ingenious as to say that the plaintiff is under an obligation to protect the defendant against liability for the consequences of his own negligence." (Prosser, Law of Torts, *supra,* § 65, p. 418.)

We think, accordingly, the conclusion may fairly be drawn that the terms "comparative negligence," "contributory negligence" and "assumption of risk" do not, standing alone, lend themselves to the exact measurements of a micrometer-caliper, or to such precise definition as to divert us from otherwise strong and consistent countervailing policy considerations. Fixed semantic consistency at this point is less important than the attainment of a just and equitable result. The interweaving of concept and terminology in this area suggests a judicial posture that is flexible rather than doctrinaire.

We pause at this point to observe that where, as here, a consumer or user sues the manufacturer or designer alone, technically, neither fault nor conduct is really compared functionally. The conduct of one party in combination with the product of another, or perhaps the placing of a defective article in the stream of projected and anticipated use, may produce the ultimate injury. In such a case, as in the situation before us, we think the term "equitable apportionment or allocation of loss" may be more descriptive than "comparative fault."

Given all of the foregoing, we are, in the wake of *Li,* disinclined to resolve the important issue before us by the simple expedient of matching linguistic labels which have evolved either for convenience or by custom. Rather, we consider it more useful to examine the foundational reasons underlying the creation of strict products liability in California to ascertain whether the purposes of the doctrine would be defeated or diluted by adoption of comparative principles. We imposed strict liability against the manufacturer and in favor of the user or consumer in order to relieve injured consumers "from *problems of proof* inherent in pursuing negligence . . . and warranty . . . remedies, . . ." (*Cronin* v. *J. B. E. Olson Corp., supra,* 8 Cal.3d at p. 133, italics added; *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d at p. 63; *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461-462 [150 P.2d 436] (conc. opn. by Traynor, J.).) As we have noted, we sought to place the burden of loss on manufacturers rather than ". . . injured persons *who are powerless to protect themselves* . . . ." (*Greenman, supra,* at p. 63; italics added; see *Escola, supra,* at p. 462; *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722] ["*protection of otherwise defenseless victims* of manufacturing defects and the spreading throughout society of the cost of compensating them"] italics added.)

The foregoing goals, we think, will not be frustrated by the adoption of comparative principles. Plaintiffs will continue to be relieved of proving

that the manufacturer or distributor was negligent in the production, design, or dissemination of the article in question. Defendant's liability for injuries caused by a defective product remains strict. The principle of protecting the defenseless is likewise preserved, for plaintiff's recovery will be reduced *only* to the extent that his own lack of reasonable care contributed to his injury. The cost of compensating the victim of a defective product, albeit proportionately reduced, remains on defendant manufacturer, and will, through him, be "spread among society." However, we do not permit plaintiff's own conduct relative to the product to escape unexamined, and as to that share of plaintiff's damages which flows from his own fault we discern no reason of policy why it should, following *Li*, be borne by others. Such a result would directly contravene the principle announced in *Li*, that loss should be assessed equitably in proportion to fault.

We conclude, accordingly, that the expressed purposes which persuaded us in the first instance to adopt strict liability in California would not be thwarted were we to apply comparative principles. What would be forfeit is a degree of semantic symmetry. However, in this evolving area of tort law in which new remedies are judicially created, and old defenses judicially merged, impelled by strong considerations of equity and fairness we seek a larger synthesis. If a more just result follows from the expansion of comparative principles, we have no hesitancy in seeking it, mindful always that the fundamental and underlying purpose of *Li* was to promote the equitable allocation of loss among all parties legally responsible in proportion to their fault.

A second objection to the application of comparative principles in strict products liability cases is that a manufacturer's incentive to produce safe products will thereby be reduced or removed. While we fully recognize this concern we think, for several reasons, that the problem is more shadow than substance. First, of course, the manufacturer cannot avoid its continuing liability for a defective product even when the plaintiff's own conduct has contributed to his injury. The manufacturer's liability, and therefore its incentive to avoid and correct product defects, remains; its exposure will be lessened only to the extent that the trier finds that the victim's conduct contributed to his injury. Second, as a practical matter a manufacturer, in a particular case, cannot assume that the user of a defective product upon whom an injury is visited will be blameworthy. Doubtless, many users are free of fault, and a defect is at least as likely as not to be exposed by an entirely innocent plaintiff who will obtain full recovery. In such cases the manufacturer's

incentive toward safety both in design and production is wholly unaffected. Finally, we must observe that under the present law, which recognizes assumption of risk as a complete defense to products liability, the curious and cynical message is that it profits the manufacturer to make his product so defective that in the event of injury he can argue that the user had to be aware of its patent defects. To that extent the incentives are inverted. We conclude, accordingly, that no substantial or significant impairment of the safety incentives of defendants will occur by the adoption of comparative principles.

 In passing, we note one important and felicitious result if we apply comparative principles to strict products liability. This arises from the fact that under present law when plaintiff sues in negligence his own contributory negligence, however denominated, may diminish but cannot wholly defeat his recovery. When he sues in strict products liability, however, his "assumption of risk" *completely bars* his recovery. Under *Li,* as we have noted, "assumption of risk" is merged into comparative principles. (13 Cal.3d at p. 825.) The consequence is that after *Li* in a negligence action, plaintiff's conduct which amounts to "negligent" assumption of risk no longer defeats plaintiff's recovery. Identical conduct, however, in a strict liability case acts as a complete bar under rules heretofore applicable. Thus, strict products liability, which was developed to free injured consumers from the constraints imposed by traditional negligence and warranty theories, places a consumer plaintiff in a worse position than would be the case were his claim founded on simple negligence. This, in turn, rewards adroit pleading and selection of theories. The application of comparative principles to strict liability obviates this bizarre anomaly by treating alike the defenses to both negligence and strict products liability actions. In each instance the defense, if established, will reduce but not bar plaintiff's claim.

 A third objection to the merger of strict liability and comparative fault focuses on the claim that, as a practical matter, triers of fact, particularly jurors, cannot assess, measure, or compare plaintiff's negligence with defendant's strict liability. We are unpersuaded by the argument and are convinced that jurors are able to undertake a fair apportionment of liability.

We are strengthened in the foregoing conclusion by the federal experience under the maritime doctrine of "unseaworthiness." For decades, seamen have been permitted to recover from shipowners for injuries caused by defects rendering a vessel "unseaworthy." (E.g., *The*

*Osceola* (1903) 189 U.S. 158, 175 [47 L.Ed. 760, 764, 23 S.Ct. 483].) As noted by many courts, the concept of "unseaworthiness" is not limited to or affected by notions of the shipowner's fault or due care, but applies to any deficiency of hull, equipment or crew, regardless of cause, which renders the ship less than reasonably fit for its intended purposes. (*Mitchell* v. *Trawler Racer, Inc.* (1960) 362 U.S. 539, 550 [4 L.Ed.2d 941, 948, 80 S.Ct. 926]; *Seas Shipping Co.* v. *Sieracki* (1946) 328 U.S. 85, 94 [90 L.Ed. 1099, 1105-1106, 66 S.Ct. 872], rehg. den., 328 U.S. 878 [90 L.Ed. 1646, 66 S.Ct. 1116].) Nonetheless, comparative principles have been made applicable to suits brought under the "unseaworthiness" doctrine, a form of strict liability, and the degree to which plaintiff's own negligence contributes to his injuries has been considered in determining the amount of his recovery. (*Pope & Talbot, Inc.* v. *Hawn* (1953) 346 U.S. 406, 408-409 [98 L.Ed. 143, 150-151, 74 S.Ct. 202].) No serious practical difficulties appear to have arisen even where jury trials are involved. (E.g., *Price* v. *Mosler* (5th Cir. 1973) 483 F.2d 275, 277-278.)

We find equally unpersuasive a final objection that the merger of the two principles somehow will abolish or adversely affect the liability of such intermediate entities in the chain of distribution as retailers (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 263 [37 Cal.Rptr. 896, 391 P.2d 168]), and bailors (*Price* v. *Shell Oil Co., supra,* 2 Cal.3d 245, 253.) We foresee no such consequence. Regardless of the identity of a particular defendant or of his position in the commercial chain the basis for his liability remains that he has marketed or distributed a defective product. If, as we believe, jurors are capable of assessing fully and fairly the legal responsibility of a manufacturer on a strict liability basis, no reason appears why they cannot do likewise with respect to subsequent distributors and vendors of the product.

We note that the majority of our sister states which have addressed the problem, either by statute or judicial decree, have extended comparative principles to strict products liability.

Our research discloses that of the more than 30 states which have adopted some form of comparative negligence, three (including California) have done so judicially. The two other states, Alaska (*Butaud* v. *Suburban Marine & Sport. Goods, Inc., supra,* 555 P.2d 42, 46) and Florida (*West* v. *Caterpillar Tractor Company, Inc., supra,* 336 So.2d 80, 89-90) have likewise, judicially, extended comparative principles to strict liability actions. At least five states have adopted comparative fault statutes which are not limited in their language to negligence actions:

Arkansas (Ark.Stat.Ann. §§ 27-1763-1765 (1975)); Maine (Me.Rev.Stat., tit. 14, § 156 (1965)); Mississippi (3 Miss. Code Ann. § 11-7-15 (1917)); New York (CPLR, art. 14-A, § 1411 (1975)); and Rhode Island (2A R.I. Gen. Laws, § 9-20-4 (1971)). The New York statute expressly applies to strict liability actions. (See CPLR, *supra*, art. 14-A, § 1411, Practice Commentaries, CP 1411:1.) The Mississippi statute has been judicially construed as extending to suits founded on strict products liability. (*Edwards* v. *Sears, Roebuck and Company* (5th Cir. 1975) 512 F.2d 276, 290.) On the other hand one state, Connecticut, has statutorily prohibited the use of comparative fault as a defense in strict liability actions. (Pub.L. No. 77-335, eff. July 1, 1977.)

Of the three decisions which have declined to apply comparative negligence to strict liability, two have noted their reliance on state comparative negligence statutes which are expressly confined to "negligence" actions. (*Melia* v. *Ford Motor Co.* (8th Cir. 1976) 534 F.2d 795, 802 [Nebraska "slight-gross" comparative negligence statute]; *Kirkland* v. *General Motors Corporation* (Okla. 1974) 521 P.2d 1353, 1367-1368 [noting the limiting statutory language but holding that driving while intoxicated was product misuse barring recovery]; see also *Kinard* v. *Coats Company, Inc.* (1976) — Colo.App. — [553 P.2d 835, 837].) At least three jurisdictions have applied comparative negligence statutes to strict liability actions, despite language arguably limiting the statute application to negligence. (*Dippel* v. *Sciano, supra*, 155 N.W.2d 55, 64; *Sun Val. Airlines, Inc.* v. *Avco-Lycoming Corp.* (D.Idaho 1976) 411 F.Supp. 598, 602-603; *Hagenbuch* v. *Snap-On Tools Corp.* (D.N.H. 1972) 339 F.Supp. 676, 681-683.) Finally, one court has judicially extended a "pure" form of comparative fault to the traditional strict liability defense of "product misuse," despite the existence of a statutory scheme of "modified" comparative negligence. (*General Motors Corp.* v. *Hopkins* (Tex. 1977) 548 S.W.2d 344, 351-352.)

Moreover, we are further encouraged in our decision herein by noting that the apparent majority of scholarly commentators has urged adoption of the rule which we announce herein. These include, from the academic community: Wade, *A Uniform Comparative Fault Act—What Should It Provide?* (1977) 10 Mich. J. L. Ref. 220; Fleming, *The Supreme Court of California 1974-1975—Foreword: Comparative Negligence at Last—By Judicial Choice* (1976) 64 Cal.L.Rev. 239, 269-271; Schwartz, Comparative Negligence (1974) § 12.1 et seq., p. 195 et seq. (see also Special Cal. Supplement re Nga Li v. Yellow Cab Co. of California (1975) § 4(B), p. 8); Wade, *On the Nature of Strict Tort Liability for Products* (1973) 44

Miss.L.J. 825, 850; Noel, *Defective Products; Abnormal Use, Contributory Negligence, and Assumption of Risk* (1972) 25 Vand.L.Rev. 93, 117-118; contra, Levine, *Strict Products Liability and Comparative Negligence: The Collision of Fault and No-Fault* (1977) 14 San Diego L.Rev. 337, 346 et seq. Among other commentaries urging such a rule are: Posner et al., *Comparative Negligence in California: Some Legislative Solutions—Part II* (1977) Los Angeles Daily Journal Report (Aug. 26, 1977) at pages 4, 9-18 (proposed legislation); Brewster, *Comparative Negligence In Strict Liability Cases* (1976) 42 J. Air L. & Com. 107, 109-117; Comment, *Comparative Negligence in Vermont: A Solution or a Problem* (1976) 40 Albany L.Rev. 777, 810; Feinberg, *The Applicability of a Comparative Negligence Defense in a Strict Products Liability Suit Based on Section 402A of the Restatement of Torts 2d* (1975) 42 Ins.Couns.J. 39, 52; Comment, *Tort Defenses to Strict Products Liability* (1969) 20 Syracuse L.Rev. 924, 925; Epstein, *Products Liability: Defenses Based on Plaintiff's Conduct* (1968) 1968 Utah L.Rev. 267, 284; Levine, *Buyer's Conduct as Affecting the Extent of Manufacturer's Liability in Warranty* (1968) 52 Minn.L.Rev. 627, 652-663; contra, Robinson, *Square Pegs (Products Liability) In Round Holes (Comparative Negligence)* (1977) 52 State Bar J. 16; Schwartz, *Pure Comparative Negligence in Action* (1972) 34 Am. Trial Law. J. 117, 129.

. We find additional significance in the provisions of the proposed Uniform Comparative Fault Act (Act), authored by Professor Wade, a recognized torts scholar, distinguished professor of law, and former dean, Vanderbilt University, current reporter of the Restatement Second of Torts, and chairman of the special committee on the Act of the National Conference of the Commissioners on Uniform States Laws (Conference). Our attention has been called to the action of the Conference in August 1977, wherein it approved adoption of the Act by a vote of 40 states to 8 (California voting favorably). The Act is the distillation of approximately five years of discussion, analysis, and contribution by a special committee and a review committee of the Conference. We quote portions of section 1 of the proposed Act: "Section 1. [Effect of Contributory Fault.] [¶] (a) In an action based on fault to recover damages for injury or death to person or harm to property, any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for an injury attributable to the claimant's contributory fault, but does not bar recovery . . . . [¶] (b) 'Fault' includes acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, *or that subject a person to strict tort liability.*" (Italics added.) While lacking any legislative sanction, the

Act, in our view, points in the direction of a responsible national trend. As such, section 1 is revealing in two notable respects: in its clear definitional expression in subsection (b) that comparative principles are to be applied to cases of "strict tort liability," and in its substitution of the broad generic term "fault," in subsection (a), as including both negligence and strict liability.

Having examined the principal objections and finding them not insurmountable, and persuaded by logic, justice, and fundamental fairness, we conclude that a system of comparative fault should be and it is hereby extended to actions founded on strict products liability. In such cases the separate defense of "assumption of risk," to the extent that it is a form of contributory negligence, is abolished. While, as we have suggested, on the particular facts before us, the term "equitable apportionment of loss" is more accurately descriptive of the process, nonetheless, the term "comparative fault" has gained such wide acceptance by courts and in the literature that we adopt its use herein.

In *Li,* we announced a system of pure comparative negligence "the fundamental purpose of which shall be to assign responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties." (13 Cal.3d, at p. 829.) Those same underlying considerations of policy which moved us judicially in *Li* to rescue blameworthy plaintiffs from a 100-year-old sanction against *all* recovery persuade us now to extend similar principles to the strict products liability area. Legal responsibility is thereby shared. We think that apportioning tort liability is sound, logical and capable of wider application than to negligence cases alone. To hold otherwise, in our view, would be to perpetuate a system which, as we noted in *Li,* Dean Prosser describes as placing ". . . upon one party the entire burden of a loss for which two are, by hypothesis, responsible." (Prosser, *supra,* § 67, p. 433.) We reiterate that our reason for extending a full system of comparative fault to strict products liability is because it is fair to do so. The law consistently seeks to elevate justice and equity above the exact contours of a mathematical equation. We are convinced that in merging the two principles what may be lost in symmetry is more than gained in fundamental fairness.

In *Li* we scrupulously abstained from issuing a detailed guidebook to the new area of comparative negligence, preferring to adopt the view of a Florida court that ". . . the trial judges of this State are capable of applying [a] comparative negligence rule without our setting guidelines

in anticipation of expected problems. The problems are more appropriately resolved at the trial level in a practical manner instead of a theoretical solution at appellate level. The trial judges are granted broad discretion in adopting such procedure as may accomplish the objectives and purposes expressed in this opinion." (*Hoffman* v. *Jones* (Fla. 1973) 280 So.2d 431, 439-440.) ■ We reaffirm the wisdom of such a course and, likewise, in the matter before us leave broad discretion in the trial court to implement the details of comparative principles in strict products liability cases.

For the guidance of trial courts, we do note the existence, under rule 49(a), Federal Rules of Civil Procedure, of a form of special verdict tailored to cases applying the maritime doctrine of strict liability for unseaworthiness, to which we have referred. Under this form, the jury is first required to answer "yes" or "no" to a series of questions setting forth possible bases for a finding that vessel unseaworthiness was a proximate cause of the plaintiff's injuries. If the jury indicates that unseaworthiness was a contributing cause, it then moves on to a second group of similar questions seeking to determine whether, and in what particulars, the plaintiff's own negligence was also a contributing factor. If the answers to these questions establish a finding of contributory negligence, the jury is told to "state in percentage the extent to which the plaintiff's own negligence contributed to his injuries. (____%)." Finally, the jury is instructed to indicate the amount of plaintiff's damages *without reference* to his own negligence. The *court* then reduces the damage award by the percentage figure the jury has supplied. (3 Devitt & Blackmar, Federal Jury Practice and Instructions (3d ed. 1977) § 96.32; see also *Menard* v. *Penrod Drilling Co.* (5th Cir. 1976) 538 F.2d 1084, 1086-1087.) We cite this form as illustrative of one technique by which the court and jury may approach the task of apportionment.

RETROACTIVITY

■ It remains for us to decide the extent to which comparative principles are to be applied to strict liability actions other than those hereafter filed. We conclude that, for reasons of public policy and the reasonable expectations of the parties to this action and litigants generally, the principles herein expressed shall apply to all cases in which trial has not begun before the date this opinion becomes final in this court. No judgment based upon a trial which was commenced prior to the finality of this opinion shall be reversible on appeal on the sole ground that principles of comparative fault were not applied. If any such

judgment is reversed on appeal for other reasons, the principles herein expressed shall be applicable to any retrial commenced after this opinion becomes final in this court. (*Li* v. *Yellow Cab Co., supra,* 13 Cal.3d at p. 829; *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 800 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224].) As in *Li,* we give particular emphasis to "considerations of reliance applicable to individual cases according to the stage of litigation which they have reached . . . ." (*Ibid.*)

While it is arguable that retroactivity should extend to the finality of *Li,* and it is true that our conclusions herein owe a distinct philosophical debt to that case, nonetheless they do not constitute a direct application of *Li.* Furthermore, in *Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 370 [131 Cal.Rptr. 78, 551 P.2d 398], decided subsequent to *Li,* we retained, if only briefly, the separate system of defenses applicable to strict products liability. Under the circumstances before us, we conclude that it would be manifestly unfair to make the present opinion effective as of the finality of *Li.*

■ We further conclude that, under the particular circumstances, comparative principles cannot be applied retroactively to the instant case in order to justify admission of the intoxication and "nonuse" evidence here challenged. The issue of comparative fault was raised for the first time on appeal, and was never placed in issue by any party at trial herein. No jury instructions on the issue were requested or given. The jury therefore had no basis for evaluating the evidence under correct principles of comparative fault. In the event of retrial, however, the principles herein announced will, of course, apply.

We turn to an explanation of the reasons which prompt us to reverse the judgment of the trial court, and then examine, for the benefit of court and counsel one of the remaining contentions of the parties.

THE SAFETY EQUIPMENT AND
INTOXICATION EVIDENCE

■ We must determine whether admission of evidence of decedent's failure to use available safety devices and of his intoxication constituted prejudicial error under rules heretofore applicable to strict liability cases. We conclude that it did.

While initially evidence bearing on decedent's intoxication was excluded, other evidence pertaining to the decedent's alleged failure to employ seat belts and door locks was admitted, apparently on the ground that nonuse of safety devices bore on the issues of proximate cause and mitigation of damages. Plaintiffs contended that evidence of Daly's intoxication, or of his failure to use available safety devices, was wholly inadmissible since contributory negligence was not a defense to an action founded in strict liability for a defective product. (*Horn* v. *General Motors Corp., supra,* 17 Cal.3d at pp. 369-371; *Luque* v. *McLean, supra,* 8 Cal.3d 136, 145.) The trial court ultimately admitted the intoxication evidence, ruling that such evidence related to decedent's failure to use the Opel's safety devices, which failure, the court reasoned, would bar recovery on the theory of product misuse "aside from any question of contributory negligence." (In fairness to the very able trial judge, it must be noted that the trial herein preceded rendition of our opinions in both *Li* and *Horn.*)

As we observed in *Horn,* to accept a "nonuse" of safety equipment as a complete defense to a products liability action would constitute but a thinly disguised subversion of the rule that contributory negligence does not prevent recovery. *Horn* expressly rejected arguments that such "nonuse" could defeat recovery on theories of "assumption of risk," "product misuse," "proximate cause," or "mitigation of damages." (*Id.,* at pp. 369-371.)

Substantial time was spent on the nonuse and intoxication issues, reasonably suggesting to the jury their central importance to the defense case. There can be little doubt that the evidence of Daly's intoxication was inflammatory. The only restrictions placed on the jury's consideration of the intoxication evidence was that it bore on the "nonuse" of safety devices in general. No limitation was placed on the conclusions which the jury could draw either from a finding of "nonuse" itself, or as to the effect on its deliberations of a finding of "nonuse." In the absence of any such restrictions, we think the jury could well have concluded that decedent's negligent failure, induced by intoxication, to use the belts and locks constituted negligent conduct which *completely barred* recovery for his death. We do not think it reasonable to conclude that plaintiffs waived their objection by failing to request limiting instructions.

In summary, our review of the record convinces us that, notwithstanding that plaintiffs' case was founded on strict products liability, evidence of decedent's failure to use available seat belts and door locks, and of his

intoxication at the time of the fatal collision, may have been improperly regarded by the jury as authorizing a defense verdict. It appears reasonably probable that, had such evidence been either excluded or its effect confined, a result more favorable to plaintiffs would have been reached. Reversal is therefore required. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Downing* v. *Barrett Mobile Home Transport, Inc.* (1974) 38 Cal.App.3d 519, 525 [113 Cal.Rptr. 277]; see *Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670-676 [117 Cal.Rptr. 1, 527 P.2d 353].)

### Defect—Component Or Product As A Whole?

■ We examine for the benefit of court and counsel, in the event of retrial, a single remaining contention of plaintiffs.

Plaintiffs challenge a jury instruction which directed that "[i]n determining whether or not the vehicle was defective you should consider all of the equipment on the vehicle including any features intended for the safety of the driver." They urge that only the precise malfunctioning component itself, and alone, may be considered in determining whether injury was caused by a defectively designed product. We disagree, concluding that the issue of defective design is to be determined with respect to the product as a whole, and that the trial court's instruction was correct.

The jury could properly determine whether the Opel's overall design, including safety features provided in the vehicle, made it "crashworthy," thus rendering the vehicle nondefective. Product designs do not evolve in a vacuum, but must reflect the realities of the market place, kitchen, highway, and shop. Similarly, a product's components are not developed in isolation, but as part of an integrated and interrelated whole. Recognizing that finished products must incorporate and balance safety, utility, competitive merit, and practicality under a multitude of intended and foreseeable uses, courts have struggled to evolve realistic tests for defective design which give weight to this necessary balancing. Thus, a number of California cases have recognized the need to "weigh" competing considerations in an overall product design, in order to determine whether the design was "defective." Recently, we ourselves in *Barker* v. *Lull* (1978) *ante,* pp. 413, 431 [143 Cal.Rptr. 225, 573 P.2d 443], have described some of the factors to be considered. (See, also, *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533, 547 [132 Cal.Rptr. 605]; *Baker* v. *Chrysler Corp.* (1976) 55 Cal.App.3d 710, 716 [127 Cal.Rptr. 745]; *Hyman* v. *Gordon* (1973) 35 Cal.App.3d 769, 773 [111 Cal.Rptr. 262].)

The danger of piecemeal consideration of isolated components has been expressly recognized. (*Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 6-7 [116 Cal.Rptr. 575]; *Dreisonstok* v. *Volkswagenwerk A.G.* (4th Cir. 1974) 489 F.2d 1066, 1071-1072, applying Virginia law.) Specifically, it has been observed that a design rendered safe in one situation may become more dangerous in others. (*Self, supra,* at pp. 6-7.) However phrased, these decisions emphasize the need to consider the product as an integrated whole.

We find that plaintiffs' other contentions lack merit.

CONCLUSION

It is readily apparent that the foregoing broad expressions of principle do not establish the duties of the jury with that fixed precision which appeals to minds trained in law and logic. Nonetheless, rather than attempt to anticipate every variant and nuance of circumstance and party that may invoke comparative principles in a strict products liability context, we deem it wiser to await a case-by-case evolution in the application of the broad principles herein expressed.

By extending and tailoring the comparative principles announced in *Li, supra,* to the doctrine of strict products liability, we believe that we move closer to the goal of the equitable allocation of legal responsibility for personal injuries. We do so by relying on what Professor Schwartz aptly terms a "predicate of fairness." In making liability more commensurate with fault we undermine neither the theories nor the policies of the strict liability rule. In *Li* we took "a first step in what we deem to be a proper and just direction, . . ." (13 Cal.3d at p. 826.) We are convinced that the principles herein announced constitute the next appropriate and logical step in the same direction.

The judgment is reversed.

Tobriner, J., Clark, J., and Manuel, J., concurred.

CLARK, J.—The reasoning of *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], as the majority point out, is equally applicable to strict liability cases and compels applying

comparative fault in those cases. (*Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 372 [131 Cal.Rptr. 78, 551 P.2d 398] (dis. opn. of Clark, J.).) Under the compulsion of *Li*, I have signed the majority opinion.

Nevertheless, again we must recognize the difficulties inherent in comparing fault. (See *American Motorcycle Assn.* v. *Superior Court* (1978) *ante*, pp. 578, 608 [146 Cal.Rptr. 182, 578 P.2d 899] (dis. opn. of Clark, J.).) Relying on the apples and oranges argument, Justices Mosk and Jefferson point out that comparative fault cannot be applied logically and consistently in strict liability cases. (*Infra*, pp. 762-764, 751 et seq.) The difficulty, however, is not limited to comparing strict liability with negligence. The same difficulty persists in almost every case in which we attempt to compare parties' negligence. (*Horn* v. *General Motors Corp., supra,* 17 Cal.3d 359, 377 (dis. opn.).)

For example, assume three drivers collide at an intersection, one being intoxicated, the second speeding, and the third having gone through a stop signal. Neither logic nor common experience can tell us how much of the loss is attributable to each driver. Logic cannot tell us that the first should bear 10 percent of the loss, the second 30, and the third 60.[1] Nor may it establish any other percentages of liability. When we substitute a defective product for one of the drivers' negligence, we neither add to nor subtract from the difficulty of the comparison, and the problem of comparison is the same whether we compare different negligent acts or compare a negligent act to a defect.

Logic failing, is there a hope that juries, or judges when juries are waived, will arrive at consistent results? Obviously not.[2] It is not a problem that the allocation of fault cannot be precisely measured —rather, in most cases there is no measuring standard.

The lack of logic and consistency not only means that most claims will not be disposed of equitably but also that attorneys may seldom reasonably evaluate the cases for purposes of settlement. And because settlement plays such a large part in the determination of accident claims the efficient administration of justice is substantially impaired.

---

[1] There will be a few situations where logic may be applicable, but even in those cases, it will not be very helpful. If both drivers causing an accident were speeding, the one driving at the greater speed should bear the greater responsibility. But is the greater responsibility 51 percent of the loss or 99 percent of the loss?

[2] In the instant case, plaintiff claims there was a defective door lock. Defendant claims plaintiff was intoxicated and failed to fasten seatbelts. Assuming both parties prove their claims, I could not find fault with either a 5 percent recovery or a 95 percent recovery.

I also must part company from Justices Mosk and Jefferson as to the *effect* of the apples and oranges argument. The difficulty in comparing fault does not warrant either returning to the all-or-nothing rule applicable to contributory negligence cases prior to *Li* or continuing the all-or-nothing rule applied in strict liability cases. Dean Prosser's famous statement remains unanswerable. It is improper to place "upon one party the entire burden of a loss for which two are, by hypothesis, responsible." (Prosser, Torts (4th ed. 1971) § 67, p. 433.) The statement is as applicable to negligence cases as it is to strict liability cases. Apples and oranges do not warrant denial of loss apportionment—they require establishing a better system of apportionment.

*Li* effectively pointed out that the existing contributory negligence system placed on one party the entire burden of a loss for which two were responsible (13 Cal.3d at p. 810, fn. 3), and today's majority opinion effectively points out that the negligent plaintiff is responsible and should not recover as much as an innocent one. (*Ante,* pp. 736-737.)

Those principles do not require a comparative fault system. Can they not be satisfied by a system which establishes a uniform index factor, such as 30, 50 or 70 percent? A uniform discount of the negligent plaintiff's recovery would eliminate the necessity of the often impossible task of comparing fault. A discount system would bring about consistency and predictability where neither now exists, permitting evaluation and settlement of claims.

Such an approach is consistent with the departure from the *Li* principle made by the majority in *American Motorcycle Assn.* v. *Superior Court, supra, ante,* page 578, and in the instant case. In *Li,* this court repeatedly emphasized that the extent of fault should govern the extent of "liability" (e.g., 13 Cal.3d at pp. 811, 813, 829). By repeated use of the word "liability" rather than recovery the emphasis was placed on fairness to the defendant in the new comparative fault doctrine, and throughout the opinion comparability of fault is emphasized. However, a selective rejection of the *Li* reasoning appears in *American Motorcycle* in connection with the discussion of joint and several liability. The fairness-to-defendant justification for comparative fault is ignored, rather the court relies upon a policy of compensating injured plaintiffs. (*Ante,* p. 578.) And the court suggests that there is a significant difference between plaintiff negligence—a failure to exercise due care for oneself —and defendant negligence—a failure to exercise due care for others. (*Ante,* p. 578.) Today's opinion, telling us that "the 'apples and oranges'

argument may be conceptually suspect," similarly emphasizes the difference between plaintiff and defendant fault, pointing out the difficulty in finding a breach of duty upon which to predicate plaintiff negligence. (*Ante,* pp. 735-736.)

In cases where the plaintiff is not negligent, the determination of liability is based on fault, and the *extent* of liability is based solely on amount of loss—whether grossly or marginally negligent, the defendant's liability is the same. By focusing on a policy of compensating injured plaintiffs, pointing out the difference between plaintiff and defendant negligence, and providing that plaintiff's recovery is to be diminished on the basis of his fault without regard to defense fairness, this court has departed from the *Li* principle, reflecting recognition of its shortcomings. We also should recognize that comparative fault—although equitable in theory—cannot be applied equitably, and precludes consistency of result, making settlement much more difficult and substantially impairing the efficient administration of justice.

We can and should do a better job. A discount system will not eliminate all inequities. Arbitrary results are inherent in attempting to adjust a loss between the two or more parties responsible, when their fault is based on different acts. The present comparative system is not only inequitable and arbitrary but also inconsistent and unpredictable. Eliminating two of the four defects by adoption of a discount system is worthy of the court's task.

Having undertaken the legislative function by repudiating contributory negligence and adopting comparative fault, we have abandoned our traditional deference to legislative province and to stare decisis. Having done so, we, like the Legislature, should reconsider our bold decisions from time to time, performing the legislative process to the best of our ability—until the Legislature awakens to reclaim and exercise its historic power.

**JEFFERSON, J.\***—I concur in part and dissent in part.

I agree with the majority's result that the judgment should be reversed because of the prejudicial error in admitting evidence of decedent's

*Assigned by the Chairperson of the Judicial Council.

intoxication and of his failure to use available safety devices. Otherwise, I part company with the majority's views.

The majority takes the position that, since *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], adopted the doctrine of comparative negligence in tort actions founded on negligence, principles of justice, fairness and equity dictate an extension of comparative principles to tort actions founded on strict liability, introduced in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]. The majority, however, does not consider it significant that it is unable to determine what labels should be given to the new comparative principles—whether the new doctrine should be known as comparative fault, equitable apportionment of loss, or equitable allocation of loss. This inability to give the new doctrine an appropriate label is some indication of the shaky ground upon which the majority has decided to tread.

The majority rejects what I consider to be a sound criticism of its holding—that it is illogical and illusory to compare elements or factors that are not reasonably subject to comparison. The majority states that it is convinced that jurors will be able to compare the noncomparables—plaintiff's negligence with defendant's strict liability for a defective product—and still reach a fair apportionment of liability.

I consider the majority conclusion a case of wishful thinking and an application of an impractical, ivory-tower approach. The majority's assumption that a jury is capable of making a fair apportionment between a plaintiff's negligent conduct and a defendant's defective product is no more logical or convincing than if a jury were to be instructed that it should add a quart of milk (representing plaintiff's negligence) and a metal bar three feet in length (representing defendant's strict liability for a defective product), and that the two added together equal 100 percent—the total fault for plaintiff's injuries; that plaintiff's quart of milk is then to be assigned its percentage of the 100 percent total and defendant's metal bar is to be assigned the remaining percentage of the total. Either the jury or the trial judge will then subtract from the total amount of plaintiff's damages an amount equal to the percentage of total fault allocated to plaintiff.

What the majority envisions as a fair apportionment of liability to be undertaken by the jury will constitute nothing more than an *unfair reduction* in the plaintiff's total damages suffered, resulting from a jury

process that necessarily is predicated on speculation, conjecture and guesswork. Because the legal concept of negligence is so utterly different from the legal concept of a product defective by reason of manufacture or design, a plaintiff's negligence is no more capable of being rationally compared with a defendant's defective product to determine what percentage each contributes to plaintiff's total damages than is the quart of milk with the metal bar—posed in the above illustration.

The majority sets forth an example of how a trial judge might instruct a jury, borrowing from a form of special verdict, set forth under rule 49(a), Federal Rules of Civil Procedure, and tailored to the maritime doctrine of strict liability for unseaworthiness. The suggested instruction only emphasizes the futility in seeking to find logic and fairness in comparing noncomparables. The suggested instruction does nothing more than tell the jury to do what I have posed heretofore, namely, to consider that a quart of milk and a metal bar equal 100 percent of fault and then decide what percentage of 100 percent is represented by each item.

There is simply no reasonable or logical formula or standard that can be given to the jury to guide it in considering a defendant's defective product and a plaintiff's negligence as constituting 100 percent of fault for plaintiff's injuries and then deciding what percentage of this 100 percent is caused by each of the two noncomparables—plaintiff's negligence on the one hand and defendant's defective product on the other. There is no doubt that a jury, when so instructed, can, and will, assess a plaintiff's negligence at some percentage between zero and 100 percent. But the percentage assessed will represent nothing more substantial or reasonable than that which results from the application of the jurors' instincts, speculations, conjectures and guesses.

I am persuaded that the jury's task under the majority's holding does not, and cannot, produce justice, equity, or any fair apportionment of fault or loss. The defendant's liability for a defective product placed in the stream of commerce should not be subject to diminution and dilution by the speculative verdict of a jury in diminishing a plaintiff's recovery of the total damages suffered from a defective product, pursuant to a trial judge's instruction that noncomparable factors must be compared to reduce the plaintiff's recovery from the total damages he has suffered to something less than the total.

A consideration of the instructions likely to be given to the jury under the majority's holding will reveal the merit and substantiality of the objections to the majority's views. Thus, a jury may, or may not, receive an instruction defining a "defect" in a product or a "defective" product. (See *Barker* v. *Lull Engineering Co.* (1978) *ante*, p. 413 [143 Cal.Rptr. 225, 573 P.2d 443].) The definition of negligence, usually given to a jury, is found in BAJI instruction No. 3.10.[1] We can assume that, in substance, the jury will be told that if it finds that defendant's product was defective in manufacture or design and that such defective product was *a* proximate cause of plaintiff's injuries, and that if it also finds that plaintiff was negligent and that such negligence was also *a* proximate cause of plaintiff's injuries, the two factors are to be considered as constituting 100 percent of fault (assuming there are no other proximate causes) for plaintiff's injuries. The jury will then be told to determine what percentage each of these factors contributes to reach the 100 percent total.

Again, an instruction to the jury might be in the form of a *revision* of BAJI instruction No. 3.50 (1975 rev.),[2] reading in essence as follows: "Contributory fault is negligence on the part of plaintiff which, combined with the defective product of defendant, contributes as a proximate cause in bringing about the injury. Contributory fault, if any, on the part of the plaintiff, does not bar a recovery by the plaintiff against the defendant but the total amount of plaintiff's damages to which he would otherwise be entitled by reason of the injuries suffered from defendant's defective product shall be reduced in proportion to the

---

[1]BAJI instruction No. 3.10 provides:

"Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under circumstances similar to those shown by the evidence.

"It is the failure to use ordinary or reasonable care.

"Ordinary or reasonable care is that care which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence.

"[You will note that the person whose conduct we set up as a standard is not the extraordinarily cautious individual, nor the exceptionally skillful one, but a person of reasonable and ordinary prudence.]"

[2]BAJI instruction No. 3.50 (1975 rev.) provides:

"Contributory negligence is negligence on the part of a plaintiff which, combining with the negligence of a defendant, contributes as a [proximate] [legal] cause in bringing about the injury.

"Contributory negligence, if any, on the part of the plaintiff does not bar a recovery by the plaintiff against the defendant but the total amount of damages to which the plaintiff would otherwise be entitled shall be reduced in proportion to the amount of negligence attributable to the plaintiff."

amount of fault—represented by his negligence—that is attributed to him, contrasted with the percentage of fault—represented by defendant's defective product—that is attributable to defendant."

But the missing element in this equation is the fact that there is no formula, no standard—other than what may be concocted in the jurors' minds—to guide the jury in equating plaintiff's negligence with defendant's defective product to make the two equal 100 percent of fault and determine the respective contributions as a definitive percentage of this total fault.

This court had occasion recently to set forth a two-pronged test for determining the existence of a product made defective by virtue of its design. The court held that a product is "defective in design either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if, in light of [certain] relevant factors . . . , the benefits of the challenged design do not outweigh the risk of danger inherent in such design." (*Barker, supra, ante,* pp. 413, 418.) The *Barker* court then made the cogent observation that "this test reflects our continued adherence to the principle that, in a product liability action, the trier of fact must focus on the *product,* not on the *manufacturer's conduct,* and that the plaintiff need not prove that the manufacturer acted unreasonably or negligently in order to prevail in such an action." (*Ibid.*) (Italics in original.)

The majority's decision herein will require the jury, on the one hand, to follow *Barker* and focus on the manufacturer's *product*—disregarding all questions of whether the manufacturer acted unreasonably or negligently—in order to determine defendant manufacturer's liability. On the other hand, the jury must next focus on plaintiff's *conduct,* in order to find that plaintiff was negligent. The jury must then *compare* its focus on plaintiff's negligent *conduct* with its focus on defendant's defective *product*—eliminating, as irrelevant, any consideration of whether defendant's conduct was unreasonable or negligent—to determine the amount of the reduction in plaintiff's total damages. The end result of this configurational analysis by a jury, I submit, based as it must be—on a comparison of noncomparables—will necessarily constitute a patently unfair result.

Juries have been uniformly instructed over the years that they are "not permitted to award a party speculative damages, which means compensation for future loss or harm which, although possible, is conjectural or

not reasonably certain." (See BAJI No. 14.60 (1977 rev.).) But the majority's holding today will require juries to reduce a party's "reasonably certain" damages by using speculation, conjecture or occult divination and thus produce a verdict for damages that is the very antithesis of the principle enunciated by BAJI No. 14.60—an instrument which will continue to be given to juries in personal injury cases.

The guessing game that will be imposed on juries by the application of comparative negligence principles to defective product liability cases will be further enhanced in those cases in which several defendants are joined in an action—some being sued on a negligence theory and others on the defective product theory and where there are several plaintiffs whose conduct may range from no negligence at all to varying degrees of negligence. The jury will be required to determine percentages of fault with respect to all the parties (and perhaps some nonparties) by seeking to compare and evaluate the *conduct* of certain parties with the *product* of other parties to produce 100 percent of fault as the necessary starting point in order to calculate a reduction in the damages suffered by each plaintiff found to be negligent. I cannot agree with the majority that such a process is reasonably workable or that it will produce an equitable result to injured plaintiffs. If a just or fair result is reached by a jury under the majority's holding, it will be strictly accidental and accomplished by pure happenstance.

With all due deference to the scholarly analysis and discussion found in the majority opinion, I must conclude, nevertheless, that the majority's view constitutes a glaring failure to appreciate the limitations on, and the realities of, our jury trial system. Under the majority's view, jurors are expected to accomplish a feat which trained judges cannot accomplish, namely, to reach a just result by starting with an untenable premise that totally different things—a plaintiff's negligent conduct and a defendant's defective product—can be added together and assigned percentages to total 100 percent, without having the means to reduce the two noncomparables to a common denominator which is the necessary ingredient to produce reasonably accurate percentages. There is no common denominator by which factors such as pounds, circles, quarts, triangles, inches, and squares can be added together for a total so that a determination can be made of the percentage contribution of each to the total. This is the situation we deal with in requiring juries to reduce a plaintiff's total damages resulting from a defendant's defective product by a conjectural determination of a percentage contribution to those damages resulting from plaintiff's negligence.

The majority finds significance in the provisions of the proposed Uniform Comparative Fault Act (Act), authored by Professor Wade, "a recognized torts scholar" and a "distinguished professor of law." The proposed Act adopts the principles of comparative fault. It defines "fault" to include acts or omissions that constitute negligence or that subject a person to strict tort liability. The proposed Act requires a reduction in a plaintiff's recovery based upon plaintiff's proportionate contributory fault. But with all due respect to the high academic qualifications of the author, the Act possesses the same weaknesses that I find in the majority's assumptions. The Act does not produce a practical formula, or any formula at all, by which the jury can avoid the task of employing conjecture, surmise and speculation in seeking to compare noncomparable factors that make up the Act's concept of total "fault." The Act's provisions, therefore, suffering from the same weaknesses that permeate the majority's holding, offer no support in logic, reason or fairness to the majority's holding.

The majority calls attention to the fact that some legal scholars and some states have either moved, or have advocated moving, in the direction of the application of comparative negligence principles to strict-liability-in-tort cases. Such authorities do not demonstrate that the principle espoused is a viable one. The fact that some legal scholars and states are satisfied with a tort principle that requires and sanctions speculation and guesswork on the part of juries—necessarily producing inequities to consumers who have suffered injuries from manufacturers' defective products—constitutes no basis for this court to follow suit.

It is my view that justice, fairness and equity are *not* served by the majority's application of the *Li* principle of comparative negligence to the tort principle of a manufacturer's strict liability in tort for a product defectively manufactured or defectively designed. Granting that a plaintiff was negligent when he suffered injury from using a defective product, a fair and equitable result is reached by imposing on the defendant manufacturer liability for the *total damages* suffered. This result is preferable to that of subjecting the injured plaintiff's claim to a diminution of his total damages suffered—predicated on the jury's application of the highly speculative, conjectural and chance formula of comparing two noncomparables.

It appeals to my sense of reason, justice and equity that we continue the existing legal principle which permits manufacturers to spread through society the costs of compensating injured plaintiffs *fully,* rather

than the adoption of an untenable legal principle which will result in *reducing* the total costs to be spread by manufacturers, but at the expense of injured plaintiffs by reducing their recovery *below* the full losses sustained through the necessarily fortuitous, conjectural and haphazard determinations to be made by juries.

Bird, C. J., concurred.

**MOSK, J.**—I dissent.

This will be remembered as the dark day when this court, which heroically took the lead in originating the doctrine of products liability (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]) and steadfastly resisted efforts to inject concepts of negligence into the newly designed tort (*Cronin* v. *J. B. E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153]), inexplicably turned 180 degrees and beat a hasty retreat almost back to square one. The pure concept of products liability so pridefully fashioned and nurtured by this court for the past decade and a half is reduced to a shambles.

The majority inject a foreign object—the tort of negligence—into the tort of products liability by the simple expedient of calling negligence something else: on some pages their opinion speaks of "comparative fault," on others reference is to "comparative principles," and elsewhere the term "equitable apportionment" is employed, although this is clearly not a proceeding in equity. But a rose is a rose and negligence is negligence; thus the majority find that despite semantic camouflage they must rely on *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], even though *Li* is purely and simply a negligence case which merely rejects contributory negligence and substitutes therefor comparative negligence.

Professor Schwartz made this acute observation (Schwartz, *Li* v. *Yellow Cab Company: A Survey of California Practice Under Comparative Negligence* (1976) 7 Pacific L. J. 747, 756): "The *Li* opinion, which was concerned with a typical automobile negligence case, contained no discussion of strict liability. In its April 24th modification of the opinion, the court in a number of places deleted the word 'fault' and substituted

the word 'negligence,' perhaps indicating that it did not intend for its holding to apply to strict liability. Further, in a footnote of the modified opinion the court stated that '[i]n employing the generic term "fault" throughout this opinion we follow a usage common to the literature on the subject of comparative negligence. In all cases, however, we intend the term to import nothing more than "negligence" in the accepted legal sense.' "

What Professor Schwartz sensed was factually accurate. We desired, in *Li*, to affect only the concept of contributory negligence, and to substitute therefor the doctrine of comparative negligence. Where contributory negligence would have previously been relevant, comparative negligence was to be its replacement. It was never contemplated that comparative negligence would be injected into litigation in which contributory negligence had been specifically barred as a valid defense.

This court has emphasized over and over again that strict products liability is an independent tort species wholly distinct from contract warranties (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d at p. 63) and from negligence (*Cronin* v. *J. B. E. Olson Corp., supra,* 8 Cal.3d at p. 133). Indeed, in *Cronin* we stressed that "the very purpose of our pioneering efforts in this field was to relieve the plaintiff from problems of proof inherent in pursuing negligence" (*id.*).[1] And in *Luque* v. *McLean* (1972) 8 Cal.3d 136 [104 Cal.Rptr. 443, 501 P.2d 1163], this court unanimously declared that "contributory negligence does not bar recovery in a strict liability action" (*id.* at p. 145). To the same effect are *Bill Loeper Ford* v. *Hites* (1975) 47 Cal.App.3d 828, 835-836 [121 Cal.Rptr. 131], and *McGoldrick* v. *Porter-Cable Tools* (1973) 34 Cal.App.3d 885, 889 [110 Cal.Rptr. 481].

The bench and bar have abided by this elementary rule. They have learned to avoid injecting negligence—whether of the defendant or the plaintiff—into a products liability case. And they have understood the reason behind the distinction between negligence of any party and products liability. It was expressed over three decades ago by Justice

---

[1]The distinction between products liability and negligence was explicated in *Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 383 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92]: "It is pointed out that in a products liability case the plaintiff in order to recover in strict liability in tort must prove that he was injured by a defect in the product and that the product was defective when it left the hands of the retailer or manufacturer; whereas to recover in negligence the plaintiff must prove the same two elements plus an additional element, namely, that the defect in the product was due to negligence of the defendant."

Traynor in his concurring opinion in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 467 [150 P.2d 436]: "As handicrafts have been replaced by mass production with its great markets and transportation facilities, the close relationship between the producer and consumer of a product has been altered. Manufacturing processes, frequently valuable secrets, are ordinarily either inaccessible to or beyond the ken of the general public. The consumer no longer has means or skill enough to investigate for himself the soundness of a product, even when it is not contained in a sealed package, and his erstwhile vigilance has been lulled by the steady efforts of manufacturers to build up confidence by advertising and marketing devices such as trade-marks. [Citations.] Consumers no longer approach products warily but accept them on faith, relying on the reputation of the manufacturer or the trade mark. . . . The manufacturer's obligation to the consumer must keep pace with the changing relationship between them; . . ." And again in *Greenman,* Justice Traynor declared the "purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (59 Cal.2d at p. 63.)

In *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 258 [85 Cal.Rptr. 178, 466 P.2d 722], this court warned that "it would do violence to the doctrine of strict liability and thwart its basic purpose, if we were to interpret [an indemnity] clause as transferring the liability for a defective article from the party putting the article in the stream of commerce, to the user or consumer of the article who is within the class the doctrine was designed to protect."

Transferring the liability, or part of the liability, from the party responsible for putting the article in the stream of commerce to the consumer is precisely what the majority propose to do. They do this by employing a euphemism: the victim's recovery is to be "proportionately reduced." The result, however delicately described, is to dilute the defect of the article by elevating the conduct of the wounded consumer to an issue of equal significance. We can be as certain as tomorrow's daylight that every defendant charged with marketing a defective product will hereafter assert that the injured plaintiff did something, anything, that conceivably could be deemed contributorily negligent: he drove the vehicle with a defective steering mechanism 56 miles an hour instead of 54; or he should have discovered a latent defect hidden in the machinery; or perhaps he should not have succumbed to the salesman's

persuasion and purchased the defective object in the first instance. I need no crystal ball to foresee that the pleading of affirmative defenses alleging contributory negligence—or the currently approved substitute terminology—will now become boilerplate.

The majority see no problem in assessing the liability of intermediate entities in the commercial chain. I do. Consider, for example, the not uncommon situation in which, pursuant to a faulty design, a manufacturer produces widgets without negligence and precisely as designed. He turns the widgets over to a distributor who sells them to a wholesaler who in turn consigns them to a retailer, none of whom commits any active act of negligence. After a defective widget finally reaches and injures the consumer, it would be consummate supererogation for a trier of fact to attempt to measure some consumer negligence against either the faulty design of the product or the responsibility of the congeries of nonnegligent persons who placed the defective product in the stream of commerce, or their responsibility vis-à-vis each other. We have retained joint and several liability in comparative negligence (*American Motorcycle Assn.* v. *Superior Court* (1978) *ante,* p. 578 [146 Cal.Rptr. 182, 578 P.2d 899]) partly because of that very problem. In any event if the consumer used the product as intended or as foreseeable (*Barker* v. *Lull Engineering Co.* (1978) *ante,* p. 413 [143 Cal.Rptr. 225, 573 P.2d 443]) it is inconsequential that he committed some extraneous act of negligence, since the injury occurs whether or not there was an act of omission or commission by the user; it results from the commercial exploitation of a defective product.

The defective product is comparable to a time bomb ready to explode; it maims its victims indiscriminately, the righteous and the evil, the careful and the careless. Thus when a faulty design or otherwise defective product is involved, the litigation should not be diverted to consideration of the negligence of the plaintiff. The liability issues are simple: was the product or its design faulty, did the defendant inject the defective product into the stream of commerce, and did the defect cause the injury? The conduct of the ultimate consumer-victim who used the product in the contemplated or foreseeable manner is wholly irrelevant to those issues.

The majority devote considerable effort to rationalizing what has been described as a mixture of apples and oranges. Their point might be persuasive if there were some authority recognizing a defense of contributory products liability, for which they are now substituting

comparative products liability. However, all our research to discover such apples and oranges has been fruitless. The conclusion is inescapable that the majority, in avoiding approval of comparative negligence in name as a defense to products liability, are thereby originating a new defense that can only be described as comparative products liability. We may now anticipate similar defenses in the vast number of other tort actions. Can comparative libel, comparative slander of title, comparative wrongful litigation, comparative nuisance, comparative fraud, be far behind? By whatever name, negligence, heretofore just one subtopic in the elaborate spectrum of torts—which require six volumes and appendices of the Restatement Second of Torts to cover—now seems destined to envelop the entire tort field.

Reliance by the majority upon federal maritime cases is to a certain extent misleading and at best unpersuasive. *Pope & Talbot, Inc.* v. *Hawn* (1953) 346 U.S. 406 [98 L.Ed. 143, 74 S.Ct. 202], which considered the plaintiff's negligence to "mitigate, but not bar, recovery," involved a carpenter, not a seaman, who was working on board a ship in dock, and who sued the shipowners for negligence in maintaining an unseaworthy vessel. No novel theory of law was involved in weighing the negligence of the plaintiff against the negligence of the defendant. None of the other Supreme Court cases cited by the majority (*The Osceola* (1903) 189 U.S. 158 [47 L.Ed. 760, 23 S.Ct. 483]; *Mitchell* v. *Trawler Racer, Inc.* (1960) 362 U.S. 539 [4 L.Ed.2d 941, 80 S.Ct. 926]; *Seas Shipping Co.* v. *Sieracki* (1946) 328 U.S. 85 [90 L.Ed. 1099, 66 S.Ct. 872]) mention the doctrine of comparative negligence.

Conceding, nevertheless, that federal courts today are likely to apply comparative negligence in maritime cases, I find there is a sound rationale for treating the law of the sea differently from common law tort litigation. Justice Stone articulated the Supreme Court's theory in *Socony-Vacuum Co.* v. *Smith* (1939) 305 U.S. 424 [83 L.Ed. 265, 59 S.Ct. 262]. He observed that a seaman, while on a vessel abroad or on the high seas "is subject to the rigorous discipline of the sea and has little opportunity to appeal to the protection from abuse of power which the law makes readily available to the landsman. . . . Withal, seamen are the wards of the admiralty, whose traditional policy has been to avoid, within reasonable limits, the application of rules of the common law . . . ." (*Id.,* at pp. 430-431 [83 L.Ed. at p. 270].) In short, admiralty is recognized as a unique field of law, generally uninfluenced by the common law, and thus it is improvidently cited for the purpose of influencing the common law.

The best reasoned authorities decline to inject negligence, contributory or comparative, into strict products liability litigation. In *Kirkland* v. *General Motors Corporation* (Okla. 1974) 521 P.2d 1353, the Oklahoma Supreme Court refused to apply a comparative negligence statute to products liability because it consistently determined that "manufacturers' products liability is not negligence, nor is it to be treated as a negligence action" (*id.* at p. 1367). A similar result followed in *Melia* v. *Ford Motor Co.* (8th Cir. 1976) 534 F.2d 795, 802, in which the court held application of a comparative negligence statute would be "inappropriate in a strict liability case." Even more emphatic was the court in *Kinard* v. *Coats Co., Inc.* (1976) — Colo.App. — [553 P.2d 835, 837]: "Although some other jurisdictions have chosen to apply comparative negligence to products liability cases [citation] in our view the better-reasoned position is that comparative negligence has no application to products liability actions under § 402A. [¶] Products liability under § 402A does not rest upon negligence principles, but rather is premised on the concept of enterprise liability for casting a defective product into the stream of commerce. [Citations.] Thus, the focus is upon the nature of the product, and the consumer's reasonable expectations with regard to that product, rather than on the conduct either of the manufacturer or of the person injured because of the product. [Citations.]" The Colorado Supreme Court completely eliminated negligence from products liability actions, declaring in such proceedings it " 'shifts the focus from the conduct of the manufacturer to the nature of the product.' " (*Hiigel* v. *General Motors Corporation* (1975) — Colo. — [544 P.2d 983, 988].)

We also declared in *Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986], that the focus is not on the conduct of the defendant, but on the nature of the product. That being so, the majority create an impossible dilemma for trial courts. If comparative negligence is to be applied, how can the trier of fact rationally weigh the conduct of the plaintiff against the defective product? I know of no other instance in American jurisprudence in which the antagonists are the conduct of a human being versus an inanimate object.

Professor Levine discusses the Alaska case (*Butaud* v. *Suburban Marine & Sport. Goods, Inc.* (Alaska 1976) 555 P.2d 42) and others relied upon by the majority (Levine, *Strict Products Liability and Comparative Negligence: The Collision of Fault and No-Fault* (1977) 14 San Diego L.Rev. 337) and concludes that it is impossible to apply a comparison of fault doctrine—comparative negligence—to a no-fault

doctrine—strict products liability: "In California, comparative fault cannot logically and consistently be applied to the strict liability cause of action. Prejudice to a plaintiff would result if the jury was required to determine the plaintiff's fault and to compare it to the defendant's conduct in a cause of action not requiring that a jury consider the existence, nature, or extent of defendant's culpability. How can comparative fault exist in a cause of action which proceeds irrespective of fault? What can a jury compare the plaintiff's fault with if the defendant's fault is not at issue? If the jury has not determined the nature, extent, or degree of the defendant's fault but has merely concluded the product is defective, how can it reduce the plaintiff's damages in proportion to respective fault?

"The application of 'comparative' fault to the strict products liability cause of action would prejudice a plaintiff because of the unusual and impossible demand placed upon a jury. In essence we would ask a jury that if they find the defendant's product was defective, irrespective of fault, they should reduce the plaintiff's damage by considering the plaintiff's culpability in proportion to the defendant's non-culpability. This requirement may be a feat which is beyond the prowess of an American jury." (*Id.* at p. 356; italics omitted.)

The Court of Appeal reached the same conclusion in *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533, 549 [132 Cal.Rptr. 605]: "Comparative negligence, therefore, as adopted in *Li*, entails a comparison of the respective negligence of the plaintiff on the one hand and of the defendant on the other. Strict liability for defective products is not based upon defendant's negligence. There may be, therefore, no negligence of the defendant to compare with that of plaintiff."

The majority note one "felicitous result" of adopting comparative negligence to products liability: the merger of assumption of risk—which they term a "bizarre anomaly"—into their innovative defense. I find that result neither felicitous nor tenable. In *Barker* v. *Lull Engineering Co., supra, ante,* at page 429, we defined a defective product as one which failed to perform safely when used in an intended or foreseeable manner. If a consumer elects to use a product patently defective when other alternatives are available, or to use a product in a manner clearly not intended or foreseeable, he assumes the risks inherent in his improper utilization and should not be heard to complain about the condition of the object. One who employs a power saw to trim his fingernails—and thereafter finds the number of his fingers reduced—

should not prevail to any extent whatever against the manufacturer even if the saw had a defective blade. I would retain assumption of risk as a total defense to products liability, as it always has been.

The majority deny their opinion diminishes the therapeutic effect of products liability upon producers of defective products. It seems self-evident that procedures which evaluate the injured consumer's conduct in each instance, and thus eliminate or reduce the award against the producer or distributor of a defective product, are not designed as an effective incentive to maximum responsibility to consumers. The converse is more accurate: the motivation to avoid polluting the stream of commerce with defective products increases in direct relation to the size of potential damage awards.

In sum, I am convinced that since the negligence of the defendant is irrelevant in products liability cases, the negligence—call it contributory or comparative—of the plaintiff is also irrelevant. The majority, by considering the comparative negligence of a plaintiff in an action in which defendant's negligence is not an issue, apply an untenable double standard. Their error is grievously unsettling to the law of torts. More significantly, this decision seriously erodes the pattern of the law which up to now reflected a healthy concern for consumers victimized by defective products placed on the market in this mechanized age through the dynamics of mass production, national and international distribution, and psychologically subtle marketing.

The length of the majority opinion and this opinion dissuades me from discussing the other issues involved herein. My abstention should not be construed as acquiescence in the majority's conclusions. I see no reason to reverse the trial court.

I would affirm the judgment.

Appellants' petition for a rehearing was denied April 13, 1978, and the opinion was modified to read as printed above. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.