BOWLING, ADMX., APPELLANT, v. HEIL COMPANY, APPELLEE.

[Cite as Bowling v. Heil Co. (1987), 31 Ohio St. 3d 277.]

(No. 86-823—Decided July 15, 1987.)

278

*Beall, Hermanies, Bortz & Major, Anthony D. Castelli* and *Ronald D. Major,* for appellant.

*Riggs, Riggs & Walker, Harry L. Riggs, Jr., H. Lawson Walker II, Wiles, Doucher, Van Buren & Boyle Co., L.P.A., James M. Wiles* and *James J. Brudny, Jr.,* for appellee.

HERBERT R. BROWN, J. Two related issues are presented in this case: first, whether principles of comparative negligence or comparative fault are applicable to a products liability action based upon strict liability in tort; and second, whether the enactment of Ohio's Contribution Among Joint Tortfeasors Act, R.C. 2307.31 and 2307.32, abolished the doctrine of joint and several liability. For the reasons that follow, we answer both questions in the negative.

## I

The court of appeals below held that Ohio's comparative negligence statute, R.C. 2315.19, does not apply to a products liability action grounded upon strict liability in tort because that statute is limited to negligence actions. We agree. R.C. 2315.19(A)(1) provides:

"*In negligence actions*, the contributory negligence of a person does not bar the person or his legal representative from recovering damages that have directly and proximately resulted from the negligence of one or more other persons, if the contributory negligence of the person bringing the action was no greater than the combined negligence of all other persons from whom recovery is sought. However, any damages recoverable by the person bringing the action shall be diminished by an amount that is proportionately equal to his percentage of negligence * * *." (Emphasis added.)

Nevertheless, the court below held that contributory negligence, when it amounts to "affirmative action" as opposed to a passive failure to discover a defect in a product or to guard against the possibility of such defect, constitutes a defense to a products liability action. The court of appeals further held that principles of "pure" comparative negligence[1] apply so as to result in an apportionment between the respective degrees of fault of a strictly liable defendant and a contributorily negligent plaintiff. We believe the court of appeals failed to recognize fundamental differences between the policies and goals underlying the case law in negligence actions and the policies and goals underlying strict liability in tort actions.

## A

In Ohio and elsewhere, products liability law, although an outgrowth of the laws of contracts and negligence, has evolved as a separate, identifiable body of law. Products liability cases decided by this court have often involved issues of negligence as well as strict liability. However, a review of those cases demonstrates that those two doctrines have consistently been regarded as complementary, but distinct.

In the seminal case of *Rogers* v. *Toni Home Permanent Co.* (1958), 167 Ohio St. 244, 4 O.O. 2d 291, 147 N.E. 2d 612, we held that where a

---

[1] "Pure" comparative negligence allows a plaintiff who is ninety-nine percent negligent to recover the remaining one percent of his damages, while the "modified" comparative negligence embodied in R.C. 2315.19 bars recovery if the plaintiff's negligence exceeds the negligence of all other persons from whom recovery is sought.

manufacturer's advertisements were aimed directly at ultimate consumers and contained representations as to the quality of a product, urging consumers to buy that product from a retailer, a consumer injured by a defect in the product could maintain an action in tort against the manufacturer based upon express warranty, though no contractual relationship existed between them. We said:

"Surely under modern merchandising practices the manufacturer owes a very real obligation toward those who consume or use his products. The warranties made by the manufacturer in his advertisements and by the labels on his products are inducements to the ultimate consumers, and the manufacturer ought to be held to *strict accountability* to any consumer who buys the product in reliance on such representations and later suffers injury because the product proves to be defective or deleterious." (Emphasis added.) *Id.* at 249, 4 O.O. 2d at 294, 147 N.E. 2d at 615-616. We therefore held that consumers were not limited solely to a negligence theory in their actions against manufacturers with whom they had not contracted.

Eight years later, in *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227, 35 O.O. 2d 404, 218 N.E. 2d 185, we expanded *Toni* to include actions in tort based upon a theory of *implied* warranty. We noted that manifest injustice would result if a person who had seen or heard an advertisement published by a manufacturer could maintain a products liability action against that manufacturer, while a person who had not seen or heard such an advertisement could not. We said:

"Such a rule looks not *to the defect in the product which produced the injury,* but focuses upon the question of whether the plaintiff saw an advertisement, which is not relevant to the creation of the risk of harm to the plaintiff." (Emphasis added.) *Id.* at 237, 35 O.O. 2d at 410, 218 N.E. 2d at 192. Thus, as in *Toni,* we held that consumers were not restricted to a negligence theory in their tort actions against manufacturers with whom they had no contractual relationship.

In *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 4 O.O. 3d 466, 364 N.E. 2d 267, we formally adopted Section 402A of the Restatement of the Law 2d, Torts (1965), as the law of Ohio. Paragraphs one and two of the syllabus in *Temple,* taken from subsections one and two of Section 402A, provide:

"1.   One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:

"(a)   the seller is engaged in the business of selling such a product, and

"(b)   it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"2.   The rule stated above applies although the seller has exercised *all*

*possible care* in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." (Emphasis added.)

We noted in *Temple* that there were "virtually no distinctions between Ohio's 'implied warranty in tort' theory and the Restatement version of strict liability in tort," and that the numerous illustrative comments to Section 402A greatly facilitated analysis in the products liability area. *Id.* at 322, 4 O.O. 3d at 469, 364 N.E. 2d at 271. Thus, the time was ripe for the formal adoption of the Restatement's formulation.

Four years later, in *Leichtamer* v. *American Motors Corp.*(1981), 67 Ohio St. 2d 456, 21 O.O. 3d 285, 424 N.E. 2d 568, we extended *Temple* to cover a defectively *designed* product, as opposed to one defectively *manufactured.* In doing so, we rejected the suggestion to restrict injured consumers in product design cases to a negligence theory.[2] We said:

"* * * A distinction between defects resulting from manufacturing processes and those resulting from design, and a resultant difference in the burden of proof on the injured party, would only provoke needless questions of defect classification, which would add little to the resolution of the underlying claims. A consumer injured by an unreasonably dangerous design should have the same benefit of freedom from proving fault provided by Section 402A as the consumer injured by a defectively manufactured product which proves unreasonably dangerous.

"The doctrine of strict liability evolved to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product. *Greenman* v. *Yuba Power Products, Inc.* (1963), 59 Cal. 2d 57, 27 Cal. Rptr. 697. *Any distinction based upon the source of the defect undermines the policy underlying the doctrine that the public interest in human life and safety can best be protected by subjecting manufacturers of defective products to strict liability in tort when the products cause harm.*" (Emphasis added.) 67 Ohio St. at 464-465, 21 O.O. 3d at 291, 424 N.E. 2d at 575.

Thus, in *Leichtamer,* we widened the chasm between theories of negligence and strict liability in tort.

The following year, in *Knitz* v. *Minster Machine Co.* (1982), 69 Ohio St. 2d 460, 23 O.O. 3d 403, 432 N.E. 2d 814, we elaborated on the standard for determining whether a product design is defective. We held in the syllabus:

"A product design is in a defective condition if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design. * * *"

---

[2] We noted that no less an authority than Dean Prosser has stated that a defective design case is " 'essentially a matter of negligence.' " *Leichtamer, supra,* at 464, 21 O.O. 3d at 290, 424 N.E. 2d at 575 (quoting Prosser, Law of Torts [4 Ed. 1971], Section 96).

It is obvious that neither prong of this test is grounded upon negligence; rather, the standard is calculated to guard against defective products by subjecting manufacturers and sellers to strict liability in tort.

Finally, in *Cremeans* v. *International Harvester Co.* (1983), 6 Ohio St. 3d 232, 6 OBR 302, 452 N.E. 2d 1281, we explained that *Knitz* does not require a plaintiff alleging a design defect to prove that a product was *both* in a defective condition *and* unreasonably dangerous. Rather, we stated, the *Knitz* standard consists of "a single, two-pronged test for determining whether a product design is in a defective condition." *Id.* at 234, 6 OBR at 304, 452 N.E. 2d at 1284. We again emphasized that the focus of a products liability case is on the *product and the nature of its defect,* not on the *conduct* of the manufacturer. Accordingly, in *Cremeans* as in *Knitz,* we "dispense[d] with any requirement for strict liability in tort that a defect be unreasonably dangerous." *Knitz, supra,* at 465, 23 O.O. 3d at 406, 432 N.E. 2d at 817, fn. 2.

Thus, a separate body of products liability law has evolved in Ohio, apart from the laws of contracts and negligence. Further, it is apparent that the negligence concept of ordinary care is not a part of the products liability doctrine, which is governed instead by the distinct principles of strict liability in tort. These principles require liability even where a manufacturer has exercised "all possible care." *Temple, supra.*

## B

Included in the body of Ohio law governing products liability is an analysis of the defenses available in actions involving allegedly defective products. Currently, two affirmative defenses based upon a plaintiff's misconduct are recognized. First, an otherwise strictly liable defendant has a complete defense if the plaintiff voluntarily and knowingly assumed the risk occasioned by the defect. See *Jones* v. *White Motor Corp.* (1978), 61 Ohio App. 2d 162, 15 O.O. 3d 292, 401 N.E. 2d 223; Section 402A of the Restatement, Comment *n,* at 356. Second, such a defendant is also provided with a complete defense if the plaintiff misused the product in an unforeseeable manner. Cf. *Menifee* v. *Ohio Welding Products, Inc.* (1984), 15 Ohio St. 3d 75, 15 OBR 179, 472 N.E. 2d 707; *Leichtamer, supra.*

The court of appeals below, construing Comment *n* to Section 402A, attempted to distinguish between negligent "affirmative action" by a plaintiff and negligent *passive* conduct by him in failing either to discover a defect or to guard against the possibility of its existence. The court held that although a plaintiff's passive contributory negligence provides no defense to a products liability action, his contributorily negligent "affirmative action" does provide a defense, and that such affirmative negligence should be compared by a jury to the fault of a strictly liable manufacturer of a defective product, in a manner similar to the principles of comparative negligence embodied in R.C. 2315.19.

Comment *n* to Section 402A provides:

*"Contributory negligence.* * * * Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."

The court of appeals has carved out a middle ground, to wit: contributory negligence consisting of "affirmative action," theoretically located between a plaintiff's failure to discover or guard against a defect and his voluntary assumption of a known risk. There is no such middle ground. Comment *n* covers the entire spectrum of conduct which can be termed "contributory negligence," as applicable to products liability actions. That spectrum begins with a mere failure to discover a defect in a product, continues with a failure to guard against the existence of a defect, and concludes with an assumption of the risk of a known defect. "Affirmative action" by the plaintiff is not left uncovered. Failure to guard against a defect can be "affirmative action." Indeed such would describe the conduct of David Bowling in this case.

Under Comment *n,* either a plaintiff's contributory negligence amounts to a voluntary assumption of a known risk, or it does not. If it does, then that conduct provides an otherwise strictly liable defendant with a complete defense. If it does not, the contributory negligence of the plaintiff provides no defense.[3]

In the case *sub judice,* the jury found that Bowling was contributorily negligent but that he had not assumed a known risk. Therefore, his contributory negligence did not provide Heil with a defense to appellant's strict liability claim.

Of course, the absence of support in either the Restatement or existing Ohio law for the recognition of comparative negligence as a defense to strict liability does not preclude this court from adopting comparative negligence principles as part of the law of products liability. This court, having developed that body of law, remains inherently vested with the power to modify it. We now turn to a consideration of the public policy underlying the application of strict liability in tort to products liability cases, in order to demonstrate why such modification is not appropriate.

---

[3] Here, we discuss only the language of Comment *n*, which does not mention the defense consisting of a plaintiff's misuse of a product in an unforeseeable manner. In some sense, such misuse is an act of contributory negligence. Nonetheless, it remains a defense to a products liability action based upon strict liability in tort. *Menifee, supra; Leichtamer, supra.*

## C

The definitive statement of the policy and goals underlying the application of strict liability in tort to cases involving defective products is provided in Comment *c* to Section 402A, at 349-350:

"On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; *that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production* against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products." (Emphasis added.)

Dean Prosser has expressed this idea in slightly different terms:

"The costs of damaging events due to defectively dangerous products can best be borne by the enterprisers who make and sell these products. *Those who are merchants and especially those engaged in the manufacturing enterprise have the capacity to distribute the losses of the few among the many who purchase the products.* It is not a 'deep pocket' theory but rather a 'risk-bearing economic' theory. The assumption is that the manufacturer can shift the costs of accidents to purchasers for use by charging higher prices for the costs of products." (Emphasis added.) Prosser & Keeton, Law of Torts (5 Ed. 1984) 692-693, Section 98.

Under negligence principles, on the other hand, liability is determined (and, under R.C. 2315.19, apportioned) according to *fault*. In negligence, we seek to make the person or persons responsible for causing a loss pay for it. In other words, we "blame" the loss on the negligent party or parties because it was they who could have avoided the loss by conforming to due care.[4] Conversely, in strict liability in tort we hold the manufacturer or seller of a defective product responsible, not because it is "blameworthy," but because it is more able than the consumers to spread that loss among those who use and thereby benefit from the product.

We recognize that strict liability cannot be absolutely divorced from traditional concepts of fault. In a sense we "blame" the loss on the manufacturer or seller because it introduced the defective product into the marketplace. However, it must be reemphasized that strict liability is at odds with traditional notions of due care. This could not be more clearly stated than in paragraph two of the syllabus in *Temple, supra,* which pro-

---

[4] We hasten to add that legal fault under negligence principles is not the same as moral fault. See 3 Harper, James & Gray, The Law of Torts (2 Ed. 1986) 103-106, Section 12.1.

vides: "The rule stated above applies *although the seller has exercised all possible care in the preparation and sale of his product*, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." (Emphasis added.)

In sum, the public policy and goals underlying strict liability differ in important respects from those underlying the law of negligence.

## D

Because this court has not previously had occasion to consider this issue of paramount importance, we look for guidance in the relevant case law from other jurisdictions. The cases are conflicting. Many inconsistent approaches have been taken. See, *e.g.*, Annotation, Applicability of Comparative Negligence Doctrine to Actions Based on Strict Liability in Tort (1981), 9 A.L.R. 4th 633.

Comparative negligence or comparative fault has been applied in products liability cases by a number of courts, both in states that have comparative negligence statutes and in states where comparative negligence was judicially adopted. See, *e.g.*, *Duncan* v. *Cessna Aircraft Co.* (Tex. 1984), 665 S.W. 2d 414; *Mulherin* v. *Ingersoll-Rand Co.* (Utah 1981), 628 P. 2d 1301; *Daly* v. *General Motors Corp.* (1978), 20 Cal. 3d 725, 144 Cal. Rptr. 380, 575 P. 2d 1162. On the other hand, numerous courts have refused to apply comparative negligence principles to products liability cases. See, *e.g.*, *Young's Machine Co.* v. *Long* (1984), 100 Nev. 692, 692 P. 2d 24; *Correia* v. *Firestone Tire & Rubber Co.* (1983), 388 Mass. 342, 446 N.E. 2d 1033; *Seay* v. *Chrysler Corp.* (1980), 93 Wash. 2d 319, 609 P. 2d 1382; *Smith* v. *Smith* (S.D. 1979), 278 N.W. 2d 155.

We believe that the better-reasoned decisions are those that decline to inject a plaintiff's negligence into the law of products liability. We agree with the court's holding in *Kinard* v. *Coats Co., Inc.* (1976), 37 Colo. App. 555, 557, 553 P. 2d 835, 837, which states:

"Although some other jurisdictions have chosen to apply comparative negligence to products liability cases * * * in our view the better-reasoned position is that comparative negligence has no application to products liability actions under § 402A.

"Products liability under § 402A does not rest upon negligence principles, but rather is premised on the concept of enterprise liability for casting a defective product into the stream of commerce. * * * Thus, the focus is upon the nature of the product, and the consumer's reasonable expectations with regard to that product, rather than on the conduct either of the manufacturer or of the person injured because of the product."

We agree with Justice Mosk of the California Supreme Court, who stated in his dissent in *Daly* v. *General Motors Corp., supra*:

"The defective product is comparable to a time bomb ready to explode; it maims its victims indiscriminately, the righteous and the evil, the careful and the careless. Thus when a faulty design or otherwise defective

product is involved, the litigation should not be diverted to consideration of the negligence of the plaintiff. The liability issues are simple: was the product or its design faulty, did the defendant inject the defective product into the stream of commerce, and did the defect cause the injury? The conduct of the ultimate consumer-victim who used the product in the contemplated or foreseeable manner is wholly irrelevant to those issues." *Id.* at 760, 144 Cal. Rptr. at 401-402, 575 P. 2d at 1183-1184.

Therefore, when we search the decisions from other jurisdictions, we find no rationale which persuades us that comparative negligence or comparative fault principles should be applied to products liability actions.

## E

Based upon the foregoing analysis, we hold that principles of comparative negligence or comparative fault have no application to a products liability case based upon strict liability in tort.[5] Strict liability, in focusing on the product rather than the conduct of its manufacturer or seller, does not seek to apportion a loss among all persons who have caused or contributed to it. Rather, it seeks to spread the loss among all users of the product. The concept of comparative fault is fundamentally inapplicable.

We therefore reverse the judgment of the court of appeals with respect to its reduction of appellant's verdict by the thirty percent found by the jury to be attributable to Bowling's contributory negligence.

## II

The court of appeals also held that under Ohio's Contribution Among Joint Tortfeasors Act, R.C. 2307.31 and 2307.32, a strictly liable defendant is not jointly and severally liable for that portion of the plaintiff's damages attributable to the negligence of another defendant. We disagree.

The doctrine of joint and several liability among tortfeasors has long been a part of the common law of Ohio. See *Transfer Co.* v. *Kelly* (1880), 36 Ohio St. 86, 90, wherein this court held: "The general rule undoubtedly is, that where damage is caused by the joint or concurrent wrongful acts of two or more persons, they may be prosecuted therefor jointly or severally."

We do not believe that the enactment of R.C. 2307.31 and 2307.32 abolished that long-standing doctrine. R.C. 2307.31 provides, in pertinent part:

"(A)   Except as otherwise provided in this section or section 2307.32 of the Revised Code, *where two or more persons are jointly or severally liable* in tort for the same * * * wrongful death, there is a right of con-

---

[5] The Sixth Circuit, faced with this issue two years ago, accurately predicted the result we reach today. See *Bailey* v. *V & O Press Co., Inc.* (C.A. 6, 1985), 770 F. 2d 601. Accord *Krosky* v. *Ohio Edison Co.* (1984), 20 Ohio App. 3d 10, 20 OBR 10, 484 N.E. 2d 704 (per George, J.).

tribution among them even though judgment has not been recovered against all or any of them. The right of contribution exists only in favor of a tortfeasor who has paid more than his proportionate share of the common liability, and his total recovery is limited to the amount paid by him in excess of his proportionate share. No tortfeasor is compelled to make contribution beyond his own proportionate share of the entire liability. * * *

"* * *

"(F) In determining the proportionate shares of tortfeasors in the entire liability their relative degrees of fault shall be considered. If equity requires the collective liability of some as a group, the group shall constitute a single share, and principles of equity applicable to contribution generally shall apply." (Emphasis added.)

We think it clear, from the language of subsection (A), that the General Assembly did not intend to abolish joint and several liability. Rather, R.C. 2307.31 and 2307.32 speak only to the relationship between or among the joint tortfeasors themselves, not to the relationship between a joint tortfeasor and the plaintiff. As we held in *National Mut. Ins. Co.* v. *Whitmer* (1982), 70 Ohio St. 2d 149, 151-152, 24 O.O. 3d 248, 249, 435 N.E. 2d 1121, 1123:

"It is clear from the provisions of the Act that the liability for contribution is distinct from the liability for the jointly committed tort. Liability to an injured party arises at the time of the tort. Liability for contribution arises only in favor of a joint tortfeasor and then only when that tortfeasor has paid more than his proportionate share of the common liability. *Ohio's statutory scheme for contribution does not concern the basic relationship of tortfeasors to one who has suffered injury but establishes the relationship of tortfeasors inter se when one of them discharges the common liability.*" (Emphasis added.)

Therefore, we hold that Ohio's Contribution Among Joint Tortfeasors Act, R.C. 2307.31 and 2307.32, does not abolish the doctrine of joint and several liability. Thus, we also reverse the judgment of the court of appeals with respect to its reduction of appellant's verdict by the thirty percent the jury found to be attributable to Robco.[6]

---

[6] Because Robco settled with appellant, Heil is entitled to a reduction of its liability equal to the amount of such settlement (plus all other settlements, as well). R.C. 2307.32(F) provides, in part:

"When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

"(1) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms otherwise provide, *but it reduces the claim against the other to the extent of any amount stipulated by the release or the covenant,* or in the amount of the consideration paid for it, whichever is the greater." (Emphasis added.)

Accordingly, the judgment of the court of appeals is reversed and the judgment of the trial court is reinstated.

*Judgment accordingly.*

MOYER, C.J., LOCHER, DOUGLAS and WRIGHT, JJ., concur.

SWEENEY, J., concurs in paragraph two of the syllabus, Part II of the opinion, and the judgment.

HOLMES, J., dissents.

WRIGHT, J., concurring. I agree with the court of appeals' premise that affirmative conduct amounting to contributory negligence should as a matter of elemental fairness be applied to claims under strict liability for defective products. While this is a case of first impression, I cannot let these feelings of what is "fair" override my duty to properly interpret a statutory mandate such as R.C. 2315.19. As the majority accurately points out, the Comparative Negligence Act is one dealing with negligence and *not* strict liability. The action that gave rise to this appeal was premised upon strict liability or accountability for defective products resulting from either the design and/or the manufacturing process. The focus is on the nature of the product complained of and *not* the conduct of the person or entity that placed the product in the marketplace.

The question here is whether we should add a defense to those noted in *Jones* v. *White Motor Corp.* (1978), 61 Ohio App. 2d 162, 15 O.O. 3d 292, 401 N.E. 2d 223 (assumption of risk) and *Menifee* v. *Ohio Welding Products, Inc.* (1984), 15 Ohio St. 3d 75, 15 OBR 179, 472 N.E. 2d 707 (unforeseeable misuse of a product). It must be emphasized that these cases dealt with complete defenses absolutely barring recovery. The focus and impact of R.C. 2315.19 is entirely different. A careful review of R.C. 2315.19 and the case law leaves no room for the construction suggested by the appellee. The result urged by the appellee could and should be accomplished by the Ohio General Assembly and not by this court. Thus, I must join the majority in reversing the court of appeals.

HOLMES J., dissenting. The syllabus law of this case should be:

1. The general principles of comparative negligence, as set forth within R.C. 2315.19, shall be applied to products liability cases based upon strict liability in tort.

2. In applying comparative negligence to products liability cases, once the jury has determined that the product defect caused the injury, the defendant is strictly liable for the harm caused by the defective product. The jury, however, must be instructed to reduce the award of damages in proportion to the plaintiff's misconduct which contributed to his own loss or injury.

3. In that the court herein applies the principles of comparative negligence to products liability cases upon the basis of the comparison of the fault of the parties occasioning the loss or injury, this court hereby abolishes the doctrine of joint and several liability in order to more fairly assess the costs of loss among the various contributing parties.

As a matter of law, decedent's conduct ought to be construed as an assumption of risk, intervening between the defect alleged and the injury received. The acts of decedent which resulted in his demise were wholly self-initiated and independent from any defect within the product. Moreover, even supposing that some liability existed, as found by the jury, the pronouncement of the General Assembly has mandated that principles of comparative negligence be applied to this and all other such negligence actions. This, the majority has refused to do, contending that the action before us is somehow not one involving negligence. The combined results of such pronouncements, in the context of the analysis of the majority, have moved Ohio law another step closer to manufacturers' absolute liability without fault. Accordingly, and for the reasons set forth below, I must dissent.

The record before us demonstrates the difficulty of applying the Restatement's assumption-of-risk standard, which requires proof that "the user or consumer discover[ed] the defect and [was] aware of the danger, and nevertheless proceed[ed] unreasonably to make use of the product and [was] injured by it * * *." 2 Restatement of the Law 2d, Torts (1965) 356, Section 402A, Comment n.

This standard as applied by the majority here requires proof of the decedent's state of mind at the very instant when he reached under the truck bed and engaged the truck bed's hoist lower switch. In that he did not speak before dying of his injuries, the burden of proof cannot be met with any degree of probability. Also, there exists a common-sense presumption that one generally does not do an act knowing that its direct consequences will be death or serious injury.

Because such facts are peculiarly within the knowledge of the decedent, the only meaningful method of proof remaining to the manufacturer is to demonstrate that decedent's act was an intentional and unreasonable exposure of himself to a danger which, although possibly initially created by the manufacturer, was known, or should have been known to the decedent. This would allow a factual demonstration to imply that decedent assumed a known risk without requiring the direct proof which is simply not available.

In the case before us, we do not have a mere passive failure to discover, but instead an affirmative action done in total disregard of the obvious and probable consequences. The truck's dump bed was specifically designed to rise and lower at the movement of a switch, which is located between the hydraulic hoist and the truck cab, bolted upon the underside of the truck chassis. Here, a metal rod was affixed to the switch and connected to a lever positioned inside the cab. The weld connecting the rod

and lever broke, which, in and of itself, caused no injury whatsoever. Since the load had just been raised when the connection broke, the lever would not operate to lower the bed.

Decedent then approached the truck and voluntarily began to investigate the problem. He leaned over the truck chassis, with the truck bed raised above him. He observed and reached downward for the switch. He pulled the switch which, as it was designed to do, lowered the truck bed, with, however, unusual speed and tragic results. In analyzing decedent's actions it is clear that he intended to bring about the lowering of the dump bed since he intentionally depressed the switch for that purpose, or, in depressing the switch, did an act which was substantially certain to engage the hoist.

The manufacturer, here, supplied a product which was reasonably safe for all anticipated uses with the reasonably clear and obvious caveat that, supposing any mechanical difficulty or defect should occur within the hydraulic system, anyone placing himself, and being caught, between the chassis and descending bed would suffer serious injury. In order to alert users to avoid such injury, large yellow warning labels were placed all around the truck bed and hoist as well as inside the cab. The instruction manual supplied by the manufacturer had this and similar warnings printed repeatedly in large capital letters:

"When any work is to be done on body or hoist and body is fully or partly raised, it must be blocked securely so it cannot fall."

More pointedly, I herewith reproduce an exact copy of the warning on the printed material placed at various positions on the truck:

**CAUTION**

**WHENEVER THE BODY IS IN ANY ELEVATED OR RAISED POSITION IT MUST BE SECURELY PROPPED OR BLOCKED SO IT CAN NOT FALL ON ANYONE**

212A1103                                    THE HEIL CO. MILWAUKEE, WIS

This reproduction has been photographically reduced. The actual warning sticker's size is 8¾ inches by 3½ inches. The lighter shade is bright yellow.

Several of such warning decals were found in the very vicinity of decedent's body, and one was observed to be located upon the exact place from which decedent's body was removed. Furthermore, the truck bed yet contained three to four tons (six to eight thousand pounds)[7] of gravel, much of

---

[7] The recommended maximum load capacity of this dump bed was 4,700 pounds.

which was toward the front of the raised bed. Also, a steel tool box was attached to the front edge of the bed, thereby increasing the load pressure upon the hydraulic hoist.

The mere act of reaching under such a raised truck bed constituted entry into a zone of danger, the specific peril anticipated being that the bed might fall. Where, as here, an apparent malfunction occurs in the hydraulic system leaving a loaded bed suspended, the danger is made more obvious. The manufacturer attempted to harness this danger by its instructions to place blocks between the chassis and the truck bed. Such expressly given warning/instruction, had it been complied with, would have obviated all danger to decedent.

Here there is no evidence of a complete failing of the hydraulic hoist system, in that there was evidence that a two-second lowering time is not incompatible with the evidence of reasonably accepted lowering times for commercial truck beds for similar use. Even supposing a defect in the hydraulic system, the manufacturer's warning was sufficient to protect the reasonably prudent person even in the extreme case of a complete failure of the hoist.

It is not possible for the manufacturer to be physically present to enforce what should be obvious safety concerns. It becomes clear, then, that the proximate cause of decedent's demise was his own deliberate assumption of a risk, which he had been warned of, expressly and circumstantially, and which peril he voluntarily entered into, notwithstanding the danger, when he easily could have opted to stand by and remain unharmed. This being the very danger which the manufacturer sought to warn decedent of, his representatives may not reasonably complain that the deceased was unaware of some specific danger.

The statutory approach taken by the majority, wherein they contend that the term "negligence actions" as utilized in R.C. 2315.19(A) excludes products liability actions, is unduly narrow and thereby misses the point of the statute, which is, after all, to ameliorate the harsh impact of common-law contributory negligence. See Legislative Service Analysis, Am. S.B. No. 165, 113th Session (1979).

Strict products liability not only arose, in part, from negligence theory, but it remains tied to and based upon negligence theory concepts. This tort, despite theoretical notions to the contrary, examines the reasonableness of the manufacturer's conduct and, upon particularized proof by the plaintiff, allows the *presumption* that a duty existed and was breached by the manufacturer. See Prosser, The Fall of the Citadel (Strict Liability to the Consumer) (1966), 50 Minn. L. Rev. 791. This merely allows an inference of negligence without direct proof upon the issue and, while changing the specific focus of proof, does not change the nature of the action.

The elements of strict liability, despite protestations to the contrary, are full of the principles of negligence. One must prove that there was a design defect resulting from the deliberate decision of the manufacturer.

The term "defect" of course invites comparison with that which is not defective, and the decision of the manufacturer is likewise comparative. "Negligence is what the test determines, yet defect is what it is called." Note, Loosing the Shackles of "No Fault" in Strict Liability: A Better Approach to Comparative Fault (1984), 33 Cleve. St. L. Rev. 339, 368; see, also, Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence (1980), 33 Vand. L. Rev. 593, 648.

Also, the required risk/utility analysis used for design defect determinations is "the very calculus of negligence, or Learned Hand's test for fault * * *." Calabresi & Hirschoff, Toward a Test for Strict Liability in Torts (1972), 81 Yale L. J. 1055, 1056. Further, the defenses utilized in products liability cases are inherently negligence defenses and focus upon the misconduct of the plaintiff, whether described as contributory negligence or assumption of the risk. Without doubt, then, strict liability is a tort theory intended to allow recovery for a manufacturer's negligent action and should fall under R.C. 2315.19.

Also, R.C. 2315.19(A)(1) provides that comparative fault principles will no longer fully divest the plaintiff of all recovery. However, it also provides that the principles of joint and several liability will not impose upon a single defendant more of an obligation to pay than his percentage of responsibility. In refusing to apply the principles enunciated in R.C. 2315.19, the majority not only unjustly burdens those who may be forced to pay an amount out of proportion to their actual liability but also creates considerable hardship for many who, while advancing meritorious claims, will receive no compensation. In the absence of the statutory compromise above, the common law provides, in accordance with the Restatement of the Law 2d, *supra*, Comment *n*, that assumption of risk and intervening cause are full, complete defenses to products liability actions. Where such misconduct is provable, there is no recovery whatsoever. *Benjamin* v. *Deffet Rentals, Inc.* (1981), 66 Ohio St. 2d 86, 90, 20 O.O. 3d 71, 74, 419 N.E. 2d 883, 886; *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227, 237, 35 O.O. 2d 404, 410, 218 N.E. 2d 185, 193. Thus, the majority embraces the unreasonable all-or-nothing standard.

The extension of comparative liability principles as legislatively set forth in R.C. 2315.19 to actions predicated upon strict liability in tort is consistent with the development of products liability law in Ohio and represents a logical and reasonable extension of this court's decision in *Anderson* v. *Ceccardi* (1983), 6 Ohio St. 3d 110, 6 OBR 170, 451 N.E. 2d 780. In that case, this court merged the defense of assumption of the risk with the defense of contributory negligence under R.C. 2315.19. I strongly dissented to this legal merger because I felt that there was a significant legal difference in the two defenses. However, such was the pronouncement of the majority of this court and is now the law of Ohio. We should utilize this law to the greatest legal and equitable purposes of all parties in this type of tort action.

. The logical extension of our holding in *Anderson* is that neither contributory negligence nor assumption of the risk, nor even unforeseeable misuse of the product, will be a complete bar to a plaintiff's recovery in a products liability action. Rather, these will be compared with the defective product in determining the percentage which each contributed to the plaintiff's injury. I am willing to concede for this consideration that the comparison should be on a "pure" comparative causation basis in that the defendant's liability for injuries occasioned by its defective product is considered a "strict" liability.

In the case *sub judice,* the jury considered liability under distinct legal theories. In the negligence case against the appellee, the jury found that the decedent was thirty percent at fault for the events which brought about his death. This should be applied by the trial court in determining the relative responsibility of the parties for the resultant compensatory damages.

This court, because of its oversight of trial procedures in Ohio, has a responsibility to encourage consistency in jury instructions. However, the majority opinion has demonstrated a complete disregard for the dilemmas created for both trial courts and juries wherein the combined effects of the instructions on products liability and negligence create a morass of competing and conflicting obligations. A pleading in negligence allows a jury instruction for mitigation of damages and the jury must comparatively balance the fault of all parties. On the other hand, a pleading in strict liability requires an instruction for either full recovery or no recovery. This application of the law by the majority extends this mystical labyrinth.

In such interpretation of the law, there is a vast capacity for abusive pleading, wherein one may plead negligence merely to have the procedural right to describe his conduct before the jurors. On the other hand, one may remove the negligence count to prevent opposing counsel from describing conduct. Supposing a pleading to be framed in negligence, strict liability and/or breach of warranty, with multiple defendants who each assert various legal theories to describe the claimant's conduct, then juror confusion is almost a certainty. See Hasten, Comparative Liability Principles: Should They Now Apply to Strict Products Liability Actions in Ohio? (1983), 14 U. Tol. L. Rev. 1151, 1177. See, also, *Stueve* v. *American Honda Motors Co.* (D. Kan. 1978), 457 F. Supp. 740, 751. Such confusion is, of course, directly attributable to the Restatement, *supra,* at Comment *n.*

As I have stated before, the combination of a strict liability theory with joint and several liability where neither theory has an element of fault, invariably leads to compensation beyond the fault or responsibility for the injury and to absolute liability. *Leichtamer* v. *American Motors Corp.* (1981), 67 Ohio St. 2d 456, 479, 21 O.O. 3d 285, 299, 424 N.E. 2d 568, 584, Prod. Liab. Rep. (CCH), Paragraph 9036; *Knitz* v. *Minster Machine Co.* (1982), 69 Ohio St. 2d 460, 468, 23 O.O. 3d 403, 408, 432 N.E. 2d 814, 820, Prod. Liab. Rep. (CCH), Paragraph 9235; *Cremeans* v. *Internatl. Harvester Co.* (1983), 6 Ohio St. 3d 232, 236, 6 OBR 302, 306, 452

N.E. 2d 1281, 1285, Prod. Liab. Rep. (CCH), Paragraph 9747; *Minnich* v. *Ashland Oil Co.* (1984), 15 Ohio St. 3d 396, 400, 15 OBR 511, 514, 473 N.E. 2d 1199, 1202. See, also, *e.g., Kampman* v. *Dunham* (1975), 37 Colo. App. 233, 547 P. 2d 263, affirmed (1977), 192 Colo. 448, 560 P. 2d 91 (full damages paid by defendant who was only one percent at fault); *Brown* v. *Keill* (1978), 224 Kan. 195, 203, 580 P. 2d 867, 873.

R.C. 2315.19 abolishes joint and several liability in negligence actions where the plaintiff is contributorily negligent, by providing that each defendant is liable only for that portion of the total damages proportionate to his negligence. The statute is a legislative recognition of the fact that "[t]here is nothing inherently fair about a defendant who is 10% at fault paying 100% of the loss, and there is no social policy that should compel defendants to pay more than their fair share of the loss. Plaintiffs now take the parties as they find them." *Brown* v. *Keill, supra,* at 203, 580 P. 2d at 874 (construing a statute similar to R.C. 2315.19 [K.S.A. Section 60-258a (d)]). See, also, *Howard* v. *Spafford* (1974), 132 Vt. 434, 321 A. 2d 74. The harsh inequities inherent in the doctrine are most acute in situations involving an insolvent joint tortfeasor. In *Kampman* v. *Dunham, supra,* the passenger of a motorcycle, whose driver was found ninety-nine percent negligent, recovered the full amount of her damages from the defendant automobile driver who was found to be only one percent at fault.

It is arguable that Ohio's Contribution Among Joint Tortfeasors Act, R.C. 2307.31, when read together with R.C. 2315.19, may not specifically abolish the doctrine of joint and several liability. However, I feel strongly that it is time for this court to do so wherever notions of comparative fault apply. Adherence to the doctrine in such cases amounts to imposing absolute liability upon defendants, regardless of the fairness of the result.

Moreover, these theories have, in the past, been utilized upon the alleged rationale that the cost of injuries should be borne by the manufacturers that put such products on the market rather than by the injured persons. Such pronouncement presupposes that its simplistic conclusion of complex economic and jurisprudential issues, which is a mere undisguised pretext for judicial social engineering, has a greater utility and validity than a tort law based upon the character and fault of the parties' actions. In point of fact a large body of literature has emerged questioning this presumption. See, generally, *e.g.,* Calabresi, Optimal Deterrence and Accidents (1975), 84 Yale L.J. 656; Calabresi & Hirschoff, Toward a Test for Strict Liability in Torts (1972), 81 Yale L.J. 1055; Epstein, Products Liability: The Search for the Middle Ground (1978), 56 N.C.L. Rev. 643; Hoenig, Product Designs and Strict Tort Liability: Is There a Better Approach? (1976), 8 Sw. U.L. Rev. 109; Kalven, Torts: The Quest for Appropriate Standards (1965), 53 Calif. L. Rev. 189; Klemme, The Enterprise Liability Theory of Torts (1976), 47 U. Colo. L. Rev. 153; Lang, Compensation of Victims—A Pious and Misleading Platitude (1966), 54 Calif.

L. Rev. 1559; Montgomery & Owen, Reflections on the Theory and Administration of Strict Tort Liability for Defective Products (1976), 27 S.C.L. Rev. 803; Plant, Strict Liability of Manufacturers for Injuries Caused by Defects in Products—An Opposing View (1957), 24 Tenn. L. Rev. 938; Posner, Strict Liability: A Comment (1973), 2 J. Leg. Stud. 205; Raleigh, The "State of the Art" in Product Liability: A New Look at an Old "Defense" (1977), 4 Ohio N.L. Rev. 249; Sachs, Negligence or Strict Product Liability: Is There Really a Difference in Law or Economics? (1978), 8 Ga. J. Internatl. & Comp. L. 259; Wade, On the Nature of Strict Tort Liability for Products (1973), 44 Miss. L.J. 825; Wilson, Products Liability, Part II, The Protection of the Producing Enterprise (1955), 43 Calif. L. Rev. 809.

Having set forth a number of ill effects of the majority decision, and that it designedly avoids the legislative determinations of R.C. 2315.19, it remains only to demonstrate that such decision is well out of step with the more broad recent trend in this area of the law. The rationales formerly asserted to promote the strict liability theory are now, in light of experience, being generally re-examined. Over three-fourths of those state courts which have examined the issue now before us have applied comparative negligence principles to products liability actions. See, *e.g.*, Note, Loosing the Shackles of "No-Fault" in Strict Liability, *supra*, at 343, fn. 15. Even California, where the theory of strict liability originated, applies such principles. See *Daly* v. *General Motors Corp.* (1978), 20 Cal. 3d 725, 144 Cal. Rptr. 380, 575 P. 2d 1162. See, also, *Duncan* v. *Cessna Aircraft Co.* (Tex. 1984), 665 S.W. 2d 414.

Although a number of states have statutes similar to Ohio's R.C. 2315.19, only one other court has refused to apply comparative principles on the veneer-thin rationale of narrowly construing the words "negligence action." *Kirkland* v. *General Motors Corp.* (Okla. 1974), 521 P. 2d 1353. Most other courts which have interpreted such statutes have found either that the statute itself was directly applicable or, at the least, that the principles enunciated were appropriate legislative guidelines. See, *e.g.*, Hasten, Comparative Liability Principles, *supra*, and cases collected at 1153-1155.

The principles behind such decisions fall into three categories. Several courts have asserted that strict liability is nothing more than allowing a presumption of negligence *per se* for placing a defective product in the stream of commerce, which is to say, the theory, although distinct, is yet one of negligence and thus amenable to comparative negligence principles. See, *e.g.*, *Dippel* v. *Sciano* (1967), 37 Wis. 2d 443, 155 N.W. 2d 55; Noel, Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk (1972), 25 Vand. L. Rev. 93, 118. Also, a number of courts and commentators have adopted a comparative causation approach which seeks to apportion responsibility for the cause of the injury in strict

liability cases. See, *e.g.,* Hasten, Comparative Liability Principles, *supra,* at 1173-1175.

The better approach utilizes a comparative fault analysis and has been the approach of several jurisdictions. See, *e.g., Suter* v. *San Angelo Foundry & Machine Co.* (1979), 81 N.J. 150, 406 A. 2d 140; *Sandford* v. *Chevrolet Div. of General Motors* (1982), 292 Ore. 590, 642 P. 2d 624. It appears to be strongly supported in the scholarly literature. See, *e.g.,* Prosser & Keeton, Law of Torts (5 Ed. 1984) 468, 478; Prosser, Comparative Negligence (1953), 51 Mich. L. Rev. 465; Schwartz, Strict Liability and Comparative Negligence (1974), 42 Tenn. L. Rev. 171, 176. Finally, it is most consistent with those principles set forth in the Ohio comparative negligence statute, R.C. 2315.19, and accords with Ohio's firm and long-lived tradition of fault-based tort law. *Taylor* v. *Cincinnati* (1944), 143 Ohio St. 426, 431, 28 O.O. 369, 371, 55 N.E. 2d 724, 727. The community at large should not be forced to absorb, through higher product pricing, a loss due in full, or in part, to the injured person's misconduct.

In the final analysis, imposition of these theories, as approved by the majority here, weighs the trial against the party with larger financial resources. The so-called "right" of contribution left to him in reality is meaningless and allows such defendant to reasonably assert that he is being haled into court for one reason only, that being to provide monetary compensation based solely upon his ability to pay. This is not what should be considered as equal justice. In these cases, the law's goals should be to compare the plaintiff's misconduct with the defendant's defective product. This comparison of liability is a principle which fairness requires. In that this court has failed to enunciate a fair principle in this field of the law, there is presented a clear need for legislative action in this regard.

Accordingly, I dissent.